DECISION
{¶ 1} Relator, Ernest T. Bryant ("relator"), has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of *Page 2 
Ohio ("commission"), to vacate orders denying relator's request for temporary total disability ("TTD") compensation, and to enter an order finding he is entitled to said compensation.
 {¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53 and Loc.R. 12 of the Tenth District Court of Appeals. On January 24, 2008, the magistrate issued a decision, including findings of fact and conclusions of law, that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.)
 {¶ 3} Relator has filed objections to the magistrate's decision, arguing that: (1) the magistrate failed to address relator's argument that the commission relied upon an expert opinion that it had previously rejected; and (2) the magistrate's application of State ex rel. Kohl'sDept. Stores v. Indus. Comm., 151 Ohio App.3d 624, 2003-Ohio-748, is misplaced.
 {¶ 4} In his first objection, relator contends that the magistrate failed to address an argument, which was first advanced in his reply brief, concerning the commission's alleged reliance upon an opinion rendered by Dr. Frank J. Staub. Relator contends that the commission previously rejected Dr. Staub's opinion, and, as such, the rule set forth in State ex rel. Zamora v. Indus. Comm. (1989), 45 Ohio St.3d 17, precluded the commission from relying upon the same.
 {¶ 5} We begin by noting that relator has waived this argument. The purpose of a reply brief is to afford the appellant, or in this case, relator, with an opportunity to "reply" to the arguments in appellee's/respondent's brief, not to raise a new argument for the first time. See, e.g., App.R. 16(C); Gilsey Invest. v. Liquor ControlComm., Franklin App. No. 07AP-1069, 2008-Ohio-2795, at ¶ 19, quotingCalex Corp. v. United Steelworkers of America (2000),137 Ohio App.3d 74, 80. The fact that the instant matter was referred to *Page 3 
a magistrate of this court for consideration does not suspend the application of that rule. See, e.g., State ex rel. Evans v.Blackwell, 111 Ohio St.3d 1, 2006-Ohio-4334, at ¶ 23 (although the magistrate considered an argument first raised in relator's reply brief, the court of appeals did not err in failing to consider that argument in rendering its decision).
 {¶ 6} Even if relator had not waived this argument, we find it has no merit. The SHO specifically stated that he was relying upon the reports of Drs. Layton and Kibbe; there is no mention of Dr. Staub's report anywhere in the order. To the extent that Drs. Layton and Kibbe read Dr. Staub's report and relied upon it to extract relator's non-work related medical history, we agree with the commission's position that such does not violate Zamora.
 {¶ 7} Relator's second objection raises the same argument that was considered and rejected by the magistrate. Upon review, we agree with the magistrate's reasoning and analysis that Dr. Layton was competent to render his opinion and, therefore, his report does constitute some evidence upon which the commission could have relied.
 {¶ 8} Following an examination of the magistrate's decision, as well as an independent review of the evidence, we overrule relator's objections to the magistrate's decision. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein, and deny relator's request for a writ of mandamus.
Objections overruled; writ denied.
 BROWN and FRENCH, JJ., concur. *Page 4 
 APPENDIX A MAGISTRATE'S DECISION Rendered January 24, 2008 IN MANDAMUS {¶ 9} Relator, Ernest T. Bryant, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio *Page 5 
("commission") to vacate its order which denied relator's application for temporary total disability ("TTD") compensation and ordering the commission to find that relator is entitled to that compensation.
Findings of Fact: {¶ 10} 1. Relator worked as a buffer and polisher for respondent The Meyer Company ("employer") for a number of years. During that time, relator was exposed to lead.
 {¶ 11} 2. In September 2005, relator filed a First Report of an Injury, Occupational Disease or Death form asserting that he had acquired lead poisoning/lead toxicity at work. Relator submitted reports showing the blood levels of lead at varying intervals of time from August 2001 to June 2004. Pursuant to Occupational Safety Health Administration (OSHA) standards, the following would be considered a normal result: "Normal 40/100g whole blood." The evidence submitted by relator yielded the following findings beginning in August 2001: 36.8, 44.8, 44.6, 39.5, 37.7, 42, 53, 49, 49, 35, 32, 36, 44, and 42 ug/100g.
 {¶ 12} 3. Relator also submitted various progress notes from his office visits with his treating physician, Kenneth Frisof, M.D. In his December 3, 2004 progress note, Dr. Frisof noted:
 Followup now that back at work.
 * * *
 [A]ffect and mentation good.
 Warned that recovery still fragile and must not risk any steps backwards like alcohol intake. *Page 6 
 {¶ 13} Dr. Frisof's note also indicates the primary diagnosis: "dementia, multiple causes [294.9]." In his February 16, 2005 office note, Dr. Frisof noted the following conditions on relator's active problem list:
 LEAD TOXICITY, NOS [984.9]
 ALCOHOL ABUSE CONTINUOUS [305.01]
 HYPERLIPIDEMIA NEC/NOS [272.4]
 SYPHILITIC MENINGTIS [094.2]
 HYPERTENSION NOS [401.9]
 [D]ementia, multiple causes [294.9]
 MUSCLE WEAKNESS [728.87]
 OCCUPATIONAL THERAPY ENCOUNTER [V57.21]
 {¶ 14} Dr. Frisof also completed a mental functional capacity assessment in February 2005. Dr. Frisof noted that relator was moderately limited in his ability to: understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. Relator was markedly limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and to be aware of normal hazards and take appropriate precautions. Dr. Frisof noted the following observations and/or medical evidence that led him to these findings:
 After a long hospitalization in the summer of 04 for dementia, including secondary to neurosyphilis, the patient was eager to return to work. He barely passed OT work preparation and *Page 7 
then on the job demonstrated multiple episodes of confusion and poor judgment. I do not believe he can do any sustained work of even minimal complexity.
 {¶ 15} 4. Relator also submitted the June 24, 2005 report of Peter S. Kibbe, M.D. In his report, Dr. Kibbe specifically noted the blood work demonstrating that relator had been exposed to lead. He also noted Dr. Frisof's medical records indicating that relator had required hospitalization in 2004 and that he suffered from several neurological injuries including neurosyphilis, lead and lead toxicity overlying a past history of alcohol abuse. Dr. Kibbe concluded:
 Given this history, the results of his multiply [sic] lead screening evaluations and given Dr. Frisof's opinion that his dementia is multifactorial and belated to lead toxicity I think it can be said within a reasonable degree of medical certainty that Mr. Bryant suffers from the sequela of lead poisoning as a result of his industrial exposure.
 {¶ 16} 5. The record also contains a physician review by Frank J. Staub, M.D., dated September 15, 2005. Dr. Staub noted that lab reports showed relator's lead levels varying from just below to just above the normal limits. He also noted Dr. Frisof's reports identifying relator's other conditions. Dr. Staub indicated that it was not possible to specifically relate relator's mental and physical deterioration over the past four years to his exposure to lead given that many of those findings are similar to what one would expect from other causes, such as neurosyphilis and alcohol abuse.
 {¶ 17} 6. By order dated September 19, 2005, the Ohio Bureau of Workers' Compensation ("BWC") disallowed relator's claim for "984.9 TOX EFF LEAD COMPND NOS," based upon the file review of Dr. Staub indicating that the requested condition was not medically supported and not proximately related to and arising out of his employment. *Page 8 
 {¶ 18} 7. Thereafter, Dr. Frisof completed a physician's report concerning relator's work ability. He indicated that relator's restrictions were permanent and that he was totally disabled from work from February 2005 to the present. Dr. Frisof indicated that relator was unable to work due to "[m]ultiple etiologies of dementia — including lead-unable to do any work that needs concentration, or is around potentially dangerous machines."
 {¶ 19} 8. Relator's appeal was heard before a district hearing officer ("DHO") on October 25, 2005. The DHO vacated the prior BWC order and granted relator's claim as follows:
 It is the finding of the District Hearing Officer that the claimant sustained an injury in the course of and arising out of employment described as follows: claimant developed lead poisoning working as a brass polisher.
 It is the order of the District Hearing Officer that the claim be allowed for LEAD POISONING.
 Currently, no evidence of compensable lost time has been submitted to the claim file.
 This order is based on Dr. Kebbe [sic] (06/24/2005).
 {¶ 20} 9. The employer appealed and had relator examined by Barry S. Layton, Ph.D. In his January 31, 2006 report, Dr. Layton provided summaries of the medical documents which he reviewed. Those records included the blood levels, Dr. Frisof's office notes, Dr. Frisof's other documentation, the medical report of Dr. Staub, as well as the medical report of Dr. Kibbe. In response to the question of whether relator has lead toxicity and/or lead poisoning, Dr. Layton responded:
 I defer to medical experts regarding lead toxicity and / or lead poisoning between 2001 and 2004. The scientific literature as I understand it is consistent with Dr. Frisof's *Page 9 
diagnosis of Lead Toxicity which is supported by blood assays of lead and ZPP which were somewhat above OSHA limits on just over half (8) of the 14 blood assays between 2001 and 2004.
 {¶ 21} In response to the question of whether relator's confusion and/or other mental or neurological symptoms were related to lead toxicity and/or lead poisoning or to some other cause, Dr. Layton responded:
 This question can not be answered to a reasonable degree of certainty: If there were no other explanation for Mr. Bryant's cognitive impairment as reported in the record it could be argued that cause of confusion and any other mental and neurological symptoms is lead toxicity and/or lead poisoning (based on the blood assays between 8/3/01 and 6/29/04). However, active diagnoses contained in Dr. Frisof's notes include neurosyphilis; alcohol abuse, continuous; as well as hyperlipidemia and hypertension. Each of these diagnoses — not only the neurosyphilis and alcohol abuse, but also (chronic) hyperlipidemia and hypertension are known to be causally related to mental impairment and neurological symptoms.
 * * *
 Based on the above material, I find no compelling argument to substantiate the claim that Mr. Bryant's confusion or other mental or neurological symptoms (and disability) are related to lead toxicity and/or lead poisoning. There are too many confounding factors with regard to cause of reported mental symptoms to do so. The record I reviewed is slender but it does not rule out etiological factors other than lead toxicity as causes for relevant symptoms, and (literally) no evidence that might be used to rule out any or all of these other etiological factors as causes of dementia independent of lead exposure. There is no material addressing the relationship of lead exposure and disability. It is not even possible for me to begin to attempt to isolate lead toxicity as the cause of reported symptoms without review of work history and potential effects of the other relevant diagnoses prior to 2001-2004 and some indication of status of alcohol abuse between 2001 and 2005. I also would require material bearing on the possibility of cognitive effects caused by chronic hypertension and hyperlipidemia. Moreover, there is *Page 10 
no material in the record indicating the basis for prescription of Risperdal, an antipsychotic medication.
(Emphasis sic.)
 {¶ 22} 10. Dr. Kibbe responded to Dr. Layton's report in a letter dated January 27, 2006. Dr. Kibbe concluded that:
 Dr. Layton's argument appears to be that since there are confounding potential other causes of cognitive impairment in this gentleman that it can not be said that lead toxicity comprises one of those. I find this argument to be insufficient to rule out the likelihood that the lead toxicity contributes to Mr. Bryant's medical impairments especially in the face of clinical and laboratory evidence presented previously.
 {¶ 23} 11. The employer's appeal was heard before a staff hearing officer ("SHO") on March 3, 2006. The SHO determined that relator's claim should be allowed for lead poisoning; however, the SHO determined that relator's request for TTD compensation was denied based upon the reports of Dr. Layton who found that any disability was not related to the allowed conditions, but, rather, to nonindustrial causes.
 {¶ 24} 12. Relator's further appeal was refused by order of the commission mailed April 15, 2005.
 {¶ 25} 13. In December 2006, relator filed a motion seeking to amend his claim to include: "Mood disorder due to general medical condition." Ultimately, relator's motion to include the additional conditions was denied.
 {¶ 26} 14. Thereafter, relator filed the instant mandamus action in this court. Conclusions of Law:
 {¶ 27} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. State ex rel. *Page 11 Pressley v. Indus. Comm. (1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. State ex rel. Elliott v. Indus. Comm. (1986),26 Ohio St.3d 76. On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State ex rel. Lewis v.Diamond Foundry Co. (1987), 29 Ohio St.3d 56. Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. State ex rel. Teece v.Indus. Comm. (1981), 68 Ohio St.2d 165.
 {¶ 28} In this mandamus action, relator makes one argument. Relator contends that Dr. Layton was not competent to render a medical opinion regarding relator's lead poisoning. Relator asserts that Dr. Layton is a neuropsychologist and is not competent to render an opinion on the medical conditions of lead poisoning, neurosyphilis, alcohol abuse, hyperlipidemia, and hypertension. Relator contends that Dr. Layton is only competent to render an opinion on psychologic and neuropsychologic issues.
 {¶ 29} Relator cites this court's decision in State ex rel. Kohl'sDept. Stores v. Indus. Comm., 151 Ohio App.3d 624, 2003-Ohio-748, in support of his argument. However, in making this argument, relator relies on a portion of the magistrate's decision which was ultimately rejected by the court. The magistrate had concluded that Dr. Bertner was not competent as a licensed psychologist to opine upon the likelihood of improvement of claimant's post-concussion syndrome or the headaches which were the focus of his opinion that she had not reached maximum medical improvement. The *Page 12 
magistrate concluded that his report did not constitute some evidence to support the commission's decision to continue the claimant's TTD compensation.
 {¶ 30} In sustaining objections to the magistrate's decision, this court found that Dr. Bertner's report did constitute some evidence upon which the commission could have determined that the claimant's allowed conditions had not reached maximum medical improvement. Specifically, this court stated:
 As a psychologist, Bertner was qualified to express an opinion as to whether claimant's allowed condition of depression had reached maximum medical improvement. The fact that Bertner may have considered her depression to find its source in a medical condition, here, claimant's headaches should not necessarily preclude consideration of his report as to the psychological aspects of her claim. Thus, we find claimant's objection to be well taken.
Id. at ¶ 7.
 {¶ 31} Turning to the situation presented in this mandamus action, the record indicates that Dr. Layton is a neuropsychologist. Neuropsychology is the branch of psychology that deals with the relationship between the nervous system, especially the brain, and cerebral or mental functions such as language, memory and perception. Upon review of Dr. Layton's reports, it is apparent that Dr. Layton accepted that relator's claim was allowed for lead poisoning. Thereafter, Dr. Layton listed and summarized all of the medical evidence which he reviewed. This evidence included the slightly elevated blood levels as well as the evidence of relator's multiple non-allowed conditions. Dr. Layton was asked to determine whether or not relator's diminished cognitive functioning was caused by the allowed condition. Dr. Layton opined that he could not say, to a reasonable degree of medical certainty, that relator's symptoms were related to the lead poisoning because his other non-allowed conditions could be causing the same symptoms. Essentially, Dr. *Page 13 
Layton opined that the medical evidence was insufficient to support the conclusion that relator's symptoms were caused by the lead poisoning. As such, the magistrate finds that Dr. Layton was competent to render his opinion and that his report does constitute some evidence upon which the commission could have relied.
 {¶ 32} Based on the foregoing, it is this magistrate's conclusion that relator has not demonstrated that the commission abused its discretion in denying him TTD compensation and relator's request for a writ of mandamus should be denied. *Page 1