[Cite as *State v. Powell*, 2018-Ohio-3944.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 17AP-808 |
| v. | : | (C.P.C. No. 16CR-7243) |
| Eric L. Powell, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 27, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Brian J. Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Eric L. Powell, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas, pursuant to jury and bench verdicts, finding him guilty of one count of murder and numerous other felonies. For the reasons that follow, we affirm.

**I. Facts and Procedural History**

{¶ 2} All charges against appellant arose out of incidents occurring on the night of December 15, 2015, at 393 South Harris Avenue (the "South Harris house") in Columbus, Ohio, a location identified by all who testified as a drug house. An escalating dispute between appellant and several other persons present at the house culminated in the shooting death of Michael Moreno as Moreno attempted to flee the house.

{¶ 3} In December 2016, the Franklin County Grand Jury returned a 20-count indictment against appellant in connection with the shooting. The counts included 1 count of aggravated burglary, 4 counts of aggravated robbery, 2 counts of kidnapping, 2 counts of

aggravated murder, 2 counts of murder, 4 counts of attempted murder, 4 counts of felonious assault, and 1 count of having a weapon while under disability. Because appellant had a previous conviction for aggravated robbery, all counts carried an enhanced 54-month firearm specification, pursuant to R.C. 2941.145(D) and 2929.14(B)(1)(a)(v), and all but the weapon under disability count carried a repeat violent offender specification under R.C. 2941.149(A). Appellant waived jury trial on these specifications and the weapon under disability count.

{¶ 4} Prior to hearing evidence before the jury on the principal offenses, the court held a hearing outside the presence of a jury to determine if the defense could bifurcate the case and have the firearm and recent repeat violent offender specifications tried to the court and thereby preclude the jury from learning of appellant's prior convictions upon which those specifications were based. The court concluded that prior cases holding that a defendant does not have a right to bifurcate elements of an offense did not apply to preclude bifurcation of separate firearm and repeat violent offender specifications acting as enhancements to the underlying crime. The court therefore allowed appellant to waive his right to a jury trial with respect to the repeat violent offender specification and enhanced firearm specification found at R.C. 2941.145(D).

{¶ 5} The court then considered appellant's motion to suppress his statements made when interrogated while in police custody. Plaintiff-appellee, State of Ohio, called Detective Robert Cutshall of the Columbus Division of Police to described the circumstances of his interrogation of appellant. The court also reviewed a video recording of that interview.

{¶ 6} Appellant then testified that he had been drinking and smoking marijuana before he was taken into custody. The police interview took place less than one hour after he was apprehended. Appellant was sufficiently intoxicated and did not remember anything about the interview until he reviewed the video recording himself. He stated that, due to impairment from alcohol and drugs, he was unable to intelligently and knowingly understand his rights and waive them during the course of the interview.

{¶ 7} After reviewing the video recording and comparing it to appellant's demeanor at the suppression hearing, the court concluded there were no visible signs of significant impairment and this was confirmed by Detective Cutshall's testimony. The court concluded

appellant's waiver of his *Miranda*[1] rights was voluntarily, knowingly, and intelligently given and denied appellant's motion to suppress his statements made in the initial police interview.

{¶ 8}   At trial, the state presented testimony from investigating police officers, three persons present in the house at the time of the shooting, and from a jailhouse informant regarding statements made by appellant while incarcerated.   In addition, the defense stipulated to the testimony of a forensic pathologist regarding the autopsy results for the victim, Moreno.  The defense called no witnesses.

{¶ 9}   Prior to trial, the state entered a nolle prosequi on 5 counts.  At the close of evidence, the court granted dismissal on a further 3 counts pursuant to appellant's Crim.R. 29 motion.  Of the 11 counts that went to the jury, the jury acquitted appellant of 1 count of aggravated murder, 1 count of murder, and 1 count of felonious assault.  The jury returned guilty verdicts on 1 count of aggravated burglary, 2 counts of aggravated robbery, 2 counts of kidnapping, 1 count of murder, and 2 counts of felonious assault.  In addition, the court then found appellant guilty of 1 count of having a weapon while under disability and all specifications as tried to the bench.

{¶ 10} After consideration of the pre-sentence investigation, the trial court sentenced appellant to a term of 15 years to life for murder, a term of 11 years for each of the aggravated burglary, aggravated robbery, and kidnapping counts, and a term of 8 years each of the felonious assault counts.  The court added a 3-year term for the weapon under disability count.  After imposition of the repeat violent offender and firearm specifications and running certain terms and specifications concurrently, the court imposed an aggregate sentence of 36 years to life.

## II. Assignments of Error

{¶ 11} Appellant appeals and brings the following two assignments of error:

> [I.] THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL.
> [II.] THE VERDICTS OF GUILTY TO AGGRAVATED BURGLARY, AGGRAVATED ROBBERY, KIDNAPPING, MURDER AND FELONIOUS ASSAULT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

### III. Discussion

{¶ 12} Appellant's first assignment of error asserts the trial court should have granted his Crim.R. 29(A) motion for acquittal based on the deficient evidence presented by the state. Appellant's second assignment of error asserts the judgments of conviction and sentence are against the manifest weight of the evidence presented at trial. The two assignments of error present overlapping issues requiring review of the testimony and other evidence presented at trial and will therefore be considered together.

{¶ 13} The standard applied to a Crim.R. 29 motion is that applied by an appellate court when reviewing the sufficiency of the evidence. *State v. Turner*, 10th Dist. No. 04AP-364, 2004-Ohio-6609, ¶ 8. The legal concepts of sufficiency of the evidence and weight of the evidence involve different determinations. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). As to sufficiency of the evidence, " 'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Id.*, citing *Black's Law Dictionary* 1433 (6 Ed.1990). A determination as to whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* When we review the sufficiency of the evidence on appeal, we construe the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. As a result, when we review the sufficiency of the evidence, we do not on appeal reweigh the credibility of the witnesses. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79.

{¶ 14} The relevant inquiry on review of the sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A reversal based on insufficient evidence has the same effect as a not-guilty verdict because such a determination "means that no rational factfinder could have voted to convict the defendant." *Tibbs v. Florida*, 457 U.S. 31, 41 (1982).

{¶ 15} As opposed to the concept of sufficiency of the evidence, the court in *Thompkins* noted:

> Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*

(Emphasis in *Thompkins.*) *Id.* at 387, quoting *Black's* at 1594. As the finder of fact, the jury is in the best position to weigh the credibility of testimony by assessing the demeanor of witnesses and the manner in which they testify, their connection or relationship with the parties, and their interest, if any, in the outcome. The jury can accept all, a part, or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, whether it is merely evidential or tends to prove the ultimate fact. *State v. McGowan*, 10th Dist. No. 08AP-55, 2008-Ohio-5894, ¶ 13, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964); *see also State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21.

{¶ 16} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Thompkins* at 387. An appellate court should reverse a conviction as against the manifest weight of the evidence in only the most "exceptional case in which the evidence weighs heavily against conviction," instances in which the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 17} Officer Travis Tucker of the Columbus Division of Police testified regarding his response to the scene of the shooting. On the night in question, he was working second shift on the west side of Columbus and responded to the call of a body found in the alley between Harris and Hague Avenues. He located the body lying in the snow a short distance north of the South Harris house. There was a considerable amount of blood around the body and, along with other responding officers, Officer Tucker determined there was more blood directly behind the South Harris house. Officer Tucker also identified photographs taken of the location of the body on the night in question and verified these accurately depicted the scene.

{¶ 18} Officer Tucker testified police were aware the South Harris house was a drug house. The initial officers responding to the scene secured the alley and house and determined that persons were still present inside the house, whereupon they summoned a SWAT team to make entry to the house because of the nature of known drug activity at the location. Although Officer Tucker was aware that an arrest was made after the SWAT team entered the house, Officer Tucker did not participate in that arrest.

{¶ 19} Officer Richard Dean Criner, Jr. of the Columbus Division of Police testified regarding his response to the crime scene as a member of the crime scene search unit ("CSSU"). He described a series of photographs taken at the crime scene, although he had not personally taken the pictures. These included photographs of the blood trail leading from the back of the South Harris house. CSSU was initially unable to locate any spent shell casings because of the snow and did not locate the shell casings until several days later when the snow had melted. These spent shell casings were located on the north side of the South Harris house near the front porch. On cross-examination, Officer Criner conceded the scene was not secured in the interval between the initial investigation on the night of the 15th to 16th and the subsequent search that located the shell casings. On the night of the initial search, CSSU did use a metal detector searching for shell casings but had no success.

{¶ 20} Rayshawn Taylor, one of the occupants of the house on the night in question, testified regarding those events. At the outset of his testimony, he explained he was dressed in jail clothes because of a pending felony drug abuse charge. He also conceded he had a prior criminal record for a burglary conviction and was presently on probation.

{¶ 21} Rayshawn testified he was living at the South Harris house around the time of the shooting and used the house to sell drugs. Also present that night were his cousin Dorrell Taylor, Dominic Pleasant, Keshawn Pittman, Fuwaad Reynolds, Shane Keys, and the eventual victim, Moreno. Dorrell was Rayshawn's cousin, and Rayshawn had known the others, including Moreno, for varying amounts of time. Rayshawn identified appellant in open court and stated he had known him for about one and one-half years, seeing him almost every day at the South Harris house. Rayshawn testified appellant socialized with the group and cut the hair of several members of the group on a regular basis.

{¶ 22} Rayshawn testified regarding tension between appellant and himself. He stated that a night or two preceding the shooting, they were all at a club called Rachel's and an altercation seemed imminent with another group. Most of the members of Rayshawn's

group left to avoid the conflict, but appellant remained behind. Although appellant had not arrived at the club with Dorrell and Rayshawn, he was socializing with them while there. Dorrell and Rayshawn left when they learned that a member of the group which they had words with might have a gun. After the fact, Rayshawn did not consider that they had abandoned appellant on this occasion or left him in a difficult position.

{¶ 23} The next day, at 10:30 or 11:00 p.m., the group were socializing at the South Harris house when appellant appeared. Appellant was allowed to come through the front door, which was an entry reserved for persons known to those in the house. Persons not personally known and simply coming to purchase drugs would enter through the back door. A person known as the "doorman" would generally be stationed at the back door to control entry and would be compensated for this duty with money or drugs. On the night in question, the doorman was Moreno, the victim.

{¶ 24} At this point in his testimony, Rayshawn was shown and identified various pictures taken of the South Harris house. These included pictures of the living room, dining room, front porch, and back porch.

{¶ 25} Rayshawn first became aware of appellant's presence in the house when he heard appellant screaming at Dorrell in the front room. Appellant was upset because Dorrell and Rayshawn had left appellant "hanging" at the club the previous night. (Tr. Vol. II at 129.)

{¶ 26} There was a sheet hanging and separating the front living room from the dining area. Also in the living room was a gaming console and a large television screen used for observing the four outside surveillance cameras, two in front and two in back.

{¶ 27} When Rayshawn entered the living room area, he observed appellant yelling "[w]e about to fight" and holding a gun. (Tr. Vol. II at 131.) Dorrell, Pittman, and Pleasant were in the living room, and Reynolds was on the staircase observing through an opening.

{¶ 28} At this point, appellant again expressed his anger over being left at the club the night before. Appellant threatened Dorrell with the gun. As this occurred, the front door opened and one of appellant's friends came in, a person that Rayshawn did not know by name but had seen a couple times before. Rayshawn described this individual as a light-skinned African-American male. Appellant pushed Dorrell onto the couch, turned around and grabbed Rayshawn, and declared "[a]s a matter of fact, y'all give me the money and all

that. Give me your money and everything. Just give me everything." (Tr. Vol. II at 138.) The newly arrived individual also brandished a gun and threatened the others.

{¶ 29} Appellant turned his attention to Rayshawn, grabbed him by the neck with the gun to the back of his head, began counting, and threatened to "blow his head off" if the others did not give up their valuables by the count of ten. (Tr. Vol. II at 139.) Rayshawn further testified no one else had a gun on his person, but there was a "house gun" on the premises that no one could reach at the time.

{¶ 30} When appellant's counting reached seven, Dorrell and Rayshawn threw their money on the table. Appellant demanded more, and Dorrell indicated the location where approximately $600 of marijuana could be found in the house. Appellant and his accomplice went into the dining room to retrieve those drugs. The bed sheet that separated the rooms closed behind them, leaving Rayshawn, Pleasant, Reynolds, and Pittman in the living room area. Rayshawn looked at them and indicated that they should "go. Get out the house." (Tr. Vol. II at 146.) Pleasant removed a two-by-four used to brace the front door against forced entry and handed it to Pittman, who dropped it. Pleasant and Pittman ran out the front door as appellant and his accomplice, alerted by the noise of the falling wood, re-entered the living room and pursued them onto the front porch. Rayshawn remained in place, uncertain what to do.

{¶ 31} Rayshawn observed the surveillance system display in the living room as appellant began shooting from the porch at Pleasant who was running out to the street. Shown a picture of the house, Rayshawn explained the location of the front camera, which in the crime scene photograph was obscured by a tree. With the two assailants now outside the house, Rayshawn closed the door and locked it and went back to again observe the view from the outside cameras using the security system monitors. He saw Pleasant fall in the street as he made his escape. The camera allowed Rayshawn to observe appellant standing on the porch firing from the front of the house out in the street and then move to the side of the porch leaning around the north side of the house to shoot at the back of the house. This was because Dorrell and Moreno had taken the opportunity to escape out the back door when appellant and his accomplice rushed to the front porch. The camera with the view of the backyard allowed Rayshawn to see Dorrell and Moreno.

{¶ 32} Rayshawn testified that appellant and his accomplice never re-entered the South Harris house. The departure of appellant, his accomplice, Dorrell, Pleasant, Pittman,

and Moreno, left only three persons in the house: Rayshawn, Keys, and Reynolds.  Reynolds remained on the stairway observing the living room through an aperture, and Rayshawn later determined that Keys spent the entire episode upstairs.  Using the monitors, Rayshawn observed Reynolds attempting to jump out the upstairs window and ran upstairs to prevent this while assuring Reynolds the assailants had left the premises.

{¶ 33} Rayshawn testified that at no time did he observe appellant's accomplice actually fire a gun.  After about five minutes, Dorrell re-appeared and Rayshawn let him in the front door.  At this time, Keys appeared from upstairs and announced he had concealed himself in the bathtub during the incident.

{¶ 34} As those still present consulted as to what to do next, they noticed what seemed to be blood in the backyard visible on the security camera.  Rayshawn, Dorrell, and Reynolds left the house, but Keys stayed behind.  At this point, none of them knew Moreno had been shot.

{¶ 35} On cross-examination, Rayshawn took the Fifth Amendment as to certain specific aspects of his prior activity as a drug dealer but admitted that the South Harris house was a drug house where he dealt drugs on the night in question.  After the shooting, Reynolds, Dorrell, and Rayshawn left with Dorrell's girlfriend in her car.  He denied on cross-examination that the three of them concocted a story to implicate appellant during that car ride.  He admitted the photos taken by police of the front of the house did not depict a surveillance camera on the front of the house in the location he had indicated.  When confronted with a summary of his interview with detectives on December 22nd, seven days after the shooting, Rayshawn admitted to certain inconsistencies.  The detective's notes indicated Rayshawn had described appellant as pulling a gun out of his waistband upon entering the house, whereas his trial testimony was that when Rayshawn moved from the back of the house to the front and first saw appellant, the gun was already in appellant's hand.  He also conceded the detective's notes indicated that his description during the interview was that appellant's light-skinned accomplice took a gun from Pleasant's person.

{¶ 36} The next witness for the state was Reynolds.  He stated he had been to the South Harris house over ten times and used it for his musical productions with his friend Delano Royster's mobile studio.  He had known Rayshawn for some time before going in the house on the night in question and about the same time for Dorrell.  He had met Moreno several months after meeting the others.  He had known Pleasant for a shorter time and

Pittman not at all until the night of the shooting. Reynolds identified appellant in open court.

{¶ 37} Reynolds testified when he got to the house on the night of the shooting, those present were himself, Rayshawn, Dorrell, Pleasant, Pittman, and Moreno. The group had been relaxing and smoking marijuana when appellant came to the door and was allowed in. Accompanying appellant were another friend whom Reynolds did not recognize and Delano Royster. Appellant's demeanor was unremarkable at first. When appellant first entered the house, Rayshawn was playing a videogame on the television, and there was a gun resting on the table next to him. Appellant then took the gun that was resting next to Rayshawn and cocked it. Appellant became agitated and began "venting." (Tr. Vol. II at 192.)

{¶ 38} Reynolds became concerned about the direction of events and began to leave the room via the upstairs staircase because he did not want to be involved in whatever was about to happen. Appellant did not seem to be angry with Reynolds but was addressing Dorrell. Reynolds went part way up the staircase to sit where he could observe the room.

{¶ 39} Appellant apparently wanted to fight Dorrell because of what had happened at the club the night before. Dorrell was not interested in fighting, particularly with a gun in appellant's hand. Appellant became more and more angry and grabbed Rayshawn by the back of the neck, put the gun to Rayshawn's head, and demanded money. Appellant began counting upwards to ten. Shortly before this, Dorrell attempted to make a move on appellant with a gun and appellant took the gun right from Dorrell's hand. After appellant took the gun from Dorrell he passed it to his accomplice. Appellant then "started asking for money and stuff." (Tr. Vol. II at 204.) Reynolds heard someone, whom he could not identify, yelling that the money was right there and appellant should take it. Appellant told his accomplice to gather money and drugs from the others while he held a gun to Rayshawn's head.

{¶ 40} During these events, Reynolds sat on the steps not knowing what to do. Reynolds was aware of one gun that was kept in the house, but it was of such poor quality that no one had confidence in it and he did not even know if it was loaded. He did see Royster upstairs and told Royster he did not know what was going on but they needed to get out of there.

{¶ 41} Reynolds saw some of the occupants attempting to flee out the front door knocking over the wooden brace that secured the door. Appellant stepped out on the porch and said "[h]ey, get back here." (Tr. Vol. II at 208.) Reynolds then heard gunfire. It was very cold and icy outside, and he thought that those fleeing would have trouble keeping their footing. Reynolds identified the two individuals who ran out the front door as Pittman and Pleasant. When Reynolds heard the first shot, he also heard people trying to run out the back door and then more shots. The first shots he heard came from the front porch, the others sounded as though they came from the side or backyard. He never directly observed appellant shooting. The first volley of three or four shots was directed toward the street, and the second volley of shots, five or six, was toward the back. Reynolds did not observe what appellant's accomplice was doing during the shooting. He did not see the accomplice out on the porch. After further reflection, Reynolds clarified that the second volley of shots could not have been fired in the backyard proper, because at that time he was hanging out the back upstairs window debating whether to jump.

{¶ 42} After the shooting began, Reynolds could not find a way out of the house and considered exiting through the upstairs window but noticed somebody sitting in appellant's car, which he recognized. When the shooting subsided, Reynolds came downstairs and found only Rayshawn and Royster downstairs.

{¶ 43} He wanted to go out the back door but could hear an engine revving in the back alley and did not know who it might be. Instead, he went to the basement and called his sister to tell her the house had been robbed and he needed her to come pick him up as quickly as possible. After about five or ten minutes had elapsed after the shooting, he left the basement and saw that no one else had returned to the house and was therefore less concerned that appellant would return and continue shooting. When Reynolds eventually left the South Harris house, he saw that appellant had gathered up money and drugs that had previously been lying on the table.

{¶ 44} At this point, Reynolds saw Rayshawn's girlfriend "Bubbles" enter the house, apparently unaware of what had just transpired. He told her to leave and asked that she drive him to a gas station nearby. From there he went home and watched the news to see what would be said. He was unaware that anyone had been hit by gunfire until he saw a news broadcast indicating that Moreno had been killed.

{¶ 45} On cross-examination, Reynolds confirmed he had not spoken with police until July 2017, long after the shooting. He denied he had told police at that time that he did not recognize the person arrested in connection with the crime. He then admitted he had lied when talking to police about that detail. He stated he was not certain whether he and Bubbles had left alone in her car or if there had been another person in the car.

{¶ 46} The next witness was Randy Lee Joseph Hunter. He stated he was currently incarcerated in the Franklin County Jail awaiting jail on murder charges. He identified appellant in open court. Hunter described a jailhouse conversation in which appellant spoke to two other inmates and described going to a house where he was angry because some persons had left him at a club. Appellant began shooting, and the occupants fled out the back door. Appellant fired about five times and one of the bullets "hit the dude in the neck." (Tr. Vol. II at 233.) Appellant also stated in that conversation that the witnesses would not show up for trial. Hunter testified he had no knowledge about appellant's case other than what he learned from the conversation. He further testified he had been offered no deal in his own case in exchange for testimony in appellant's case.

{¶ 47} The next witness for the state was Pittman. He described the events as he experienced them on the night in question. He was at the South Harris house with his friend Pleasant. Also there were Dorrell and Royster, whom he knew, and Reynolds, whom he had not met before. Pittman had never met appellant before that night. He identified appellant in open court.

{¶ 48} Pittman also saw two people at the house who he later learned were Moreno and Keys. He was playing Madden NFL on the videogame console in the house when he let in three people. One of them was probably Royster, another was appellant, and the third was someone that Pittman could not identify. This third person was a dark-skinned African-American male. Right after the three entered, Pittman heard a gun cocked in the next room. He heard an argument and heard someone say "[e]mpty out your pockets." (Tr. Vol. II at 281.) He immediately got up and ran out. He did not hear anyone count to ten or any response from the persons in the next room who were apparently threatened with the gun. As he ran out with Pleasant, they did not have to remove a two-by-four or otherwise unsecure the door. The wood was already placed to the side of the door and did not need to be moved. As they ran out, they heard gunshots. He did not know who was firing and did not turn around to look. They ran next door and jumped over a gate into the neighbor's

yard. He then heard two or three more shots after he was already in the neighboring yard. He did not know what direction the shots came from or where they were aimed.

{¶ 49} When the firing subsided, Pittman got up and began walking down Harris Avenue. He did not speak to police until several months later. When confronted with a summary of his prior interview with police, Pittman denied telling police he had seen appellant grab a gun off a table. He reiterated that his accurate recollection was that he had not seen appellant specifically holding a gun but had only overheard threats from the next room. He conceded he had lied when he told police that appellant entered the residence and grabbed Pleasant's Smith & Wesson handgun off a table. He stated he specifically identified appellant as the person that grabbed the gun and cocked it because he did not know the other two individual's names. He did not remember telling police he heard "[i]f they move, shoot them." (Tr. Vol. III at 291.) He conceded that he had told police he observed appellant robbing Dorrell of money. He revised his trial testimony to include this detail. On cross-examination, he reiterated he had not seen appellant at any time with a gun, but had seen appellant pick up money off the table after the threats were made.

{¶ 50} Detective Cutshall testified for the state. He described his response to the scene at the time of the crime and how parole officers had set up a perimeter and called the SWAT team when they ascertained someone was inside the house in a potential barricade situation. Detective Cutshall was familiar with SWAT procedures and expected that SWAT teams would knock down any exterior cameras using non-lethal ammunition. The barricade situation ended when the individual inside the house voluntarily emerged. The SWAT team entered to clear the residence and later turned the house over to investigators to gather evidence.

{¶ 51} When shown pictures of the residence, Detective Cutshall identified them to show that one of the security cameras on the front of the house had been knocked down using non-lethal ammunition. Investigators had a good deal of trouble gathering evidence that day because of the state of the extreme cold and snow-covered ground. He described photographs showing the state of Moreno's body when recovered in the alley and evidence that the body had been struck by a vehicle.

{¶ 52} The victim, Moreno, was initially misidentified as another person well known to local police. The initial search recovered nothing of great evidentiary value. A flip phone recovered near the body was identified through DNA analysis as belonging to Pittman.

Investigators collected the security camera controller, but it was not set to record on the night in question. Investigators discovered a .40 caliber Hi-Point pistol above the attic access hatch in the house. Upon returning to the South Harris house after several days had passed and the snow had melted somewhat, investigators were able to recover several shell casings in the yard on the north side of the residence. These were spent 9-millimeter shell casings. The location of the casings was consistent with someone standing on the side of the porch firing around the north side of the house toward the backyard and having the casing ejected upwards and to the right from an automatic pistol. Investigators did not recover the projectile that struck and killed Moreno, so they were unable to further establish the 9-millimeter casings were related to the shooting on the night in question. The detective conceded there was no way to determine how long the shell casings had been on the ground before they were recovered.

{¶ 53} The stipulation regarding the forensic pathology report on Moreno's death indicated that Moreno died from a single gunshot wound entering on the right side of his upper back, transecting the right carotid artery, and then exiting under the right jaw.

{¶ 54} Appellant now asserts on appeal that the physical evidence, in conjunction with the inconsistent and conflicting testimony of the three principal prosecution eyewitnesses, are insufficient to support conviction for aggravated burglary, aggravated robbery, kidnapping, felonious assault, murder, and having a weapon while under disability. Appellant stresses that the witnesses' testimonies were inconsistent with each other and with their prior statements to police.

{¶ 55} When Rayshawn first spoke to police about the case, he stated he saw appellant pull a gun from his waistband and appellant's unidentified accomplice take a gun from Pleasant's hip. At trial, he testified appellant had the gun in his hand when Rayshawn first saw him and that the accomplice came in already holding a gun. Pittman initially told police that appellant had a gun, but testified at trial he saw Dorrell with a gun but not appellant. Appellant also points out that both Rayshawn and Reynolds testified that Pittman and Pleasant had to remove a two-by-four bracing the front door in order to escape, but Pittman's statement was that this was not necessary. Rayshawn testified that appellant's accomplice entered the house holding a gun sometime after appellant had entered, but Pittman testified he personally let three black males, including appellant, come into the house as a group. Rayshawn testified that Dorrell never had a gun, but both

Reynolds and Pittman described Dorrell as having a gun. The witnesses' testimonies also differed on the spoken interaction between appellant and his victims: Rayshawn and Reynolds both testified appellant held a gun to Rayshawn's head and counted up to ten while demanding money from everyone, but Pittman did not hear any counting. Only Reynolds testified that while the gun was held to Rayshawn's head, Rayshawn was pleading and "really squealing." (Tr. Vol. II at 198.)

{¶ 56} In order to prove the charge of aggravated burglary, the state was held to prove that appellant, by force, stealth, or deception, trespassed an occupied structure, when another person other than an accomplice was present, with purpose to commit any criminal offense therein, and appellant inflicted, attempted to inflict, or threatened physical harm, and/or had a deadly weapon on his person or under his control. R.C. 2911.11(A). "Trespass" is defined under R.C. 2911.21(A)(1) as knowingly and without privilege entering or remaining on the premises of another. "Privilege" is "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).

{¶ 57} The state concedes appellant may have been privileged to initially enter the South Harris house by invitation, but points out that "a privilege once granted may be revoked." *State v. Steffen*, 31 Ohio St.3d 111, 115 (1987). This is consistent with the definition of trespass, which specifies that either entering or *remaining* on the premises constitutes trespass. R.C. 2911.21(A)(12); *see also id.* The trier of fact may determine from the circumstances whether a privilege was revoked. *Columbus v. Peoples*, 10th Dist. No. 05AP-247, 2006-Ohio-1718, ¶ 32. In *Steffen*, the Supreme Court of Ohio concluded the jury was justified in inferring from the evidence that the defendant's privilege to remain on the premises terminated when he commenced criminal conduct, in the form of an assault, against other persons. *Id.* at 115.

{¶ 58} The jury in the present case could conclude that, regardless of the circumstances of appellant's initial entry into the house, his use of a gun to threaten and then rob Rayshawn and Dorrell terminated whatever privilege attached to his entry. Appellant's continued presence inside the residence, enforced by brandishing a firearm and threats, establishes the trespass, criminal offense, threat to inflict physical harm, and having a deadly weapon elements of R.C. 2911.11(A). Appellant's conviction for aggravated

burglary was not against the manifest weight of the evidence nor supported by insufficient evidence.

{¶ 59} The jury convicted appellant of robbing Rayshawn and Dorrell. R.C. 2911.01(A) defines aggravated robbery as:

> No person, in attempting or committing a theft offense * * * shall do any of the following: (1) [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; * * * (3) [t]o inflict, or attempt to inflict, serious physical harm on another.

See also State v. Wade, 10th Dist. No. 16AP-674, 2018-Ohio-976, ¶ 43. Although the witnesses' testimonies are inconsistent as to details, Rayshawn and Reynolds both testified appellant held a gun to Rayshawn's head and counted to ten while demanding money and, implicitly, drugs. The jury, as finder of fact, was free to assess the credibility of this testimony and weigh it against the moderately inconsistent testimony offered by Pittman. If believed, the testimony was sufficient to support a conviction for aggravated robbery of Rayshawn and Dorrell, and establish these convictions were not against the manifest weight of the evidence.

{¶ 60} The jury convicted appellant of kidnapping of Rayshawn and Dorrell. R.C. 2905.01(A)(2) defines kidnapping as follows: "[n]o person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * [t]o facilitate the commission of any felony or flight thereafter." See generally State v. Win, 121 Ohio St.3d 413, 2009-Ohio-1059, ¶ 14. The testimony of Rayshawn and Dorrell established that both were restrained of their liberty in order to facilitate the commission of aggravated robbery. Appellant physically restrained Rayshawn while holding a gun to his head, and appellant ordered Dorrell about the house at gunpoint. The evidence is sufficient to support the verdicts, and the verdicts are not against the manifest weight of the evidence.

{¶ 61} In order to establish the elements of murder under R.C. 2903.02(B) as charged, the state was held to prove appellant caused the death of Moreno as a proximate result of committing or attempting to commit aggravated burglary, aggravated robbery, kidnapping, or felonious assault.

{¶ 62} Appellant stresses on appeal that the state's case lacked certain direct and circumstantial evidence. The fatal bullet was not recovered, nor was a gun recovered matching the shell casings discovered outside. Moreover, these casings were not recovered until several days had passed, and during this period of time the crime scene was unsecured.

{¶ 63} Balancing these alleged uncertainties, however, is the detailed testimony of the eyewitnesses. Rayshawn watched on the house's security camera as appellant fired from the front porch at the fleeing Pittman and Pleasant, then leaned around the side of the house and fired into the backyard where Dorrell and Moreno were fleeing out the back door. Reynolds testified he also heard two sets of shots from the direction of the porch, and after some initial uncertainty in his testimony, specified the second volley of shots could not have been fired from the backyard proper, because Reynolds was himself hanging out the window at that time and had a direct view of the backyard. Reynolds also saw appellant exit onto the porch with a gun just prior to shots being fired, although he did not observe appellant shooting.

{¶ 64} The prison informant, Hunter, overheard appellant tell another inmate about the incident, describing how he was upset that his friends had abandoned him at a club in a dangerous situation, later argued with those friends, begun shooting, and hit a man in the back of the neck.

{¶ 65} Testimony from Detective Cutshall and Officer Criner established that shell casings ejected upwards and to the right from a weapon fired from the front porch, facing west, and aimed around the north side of the house toward the backyard would have landed in the vicinity in which the investigators recovered shell casings. The location of blood in the backyard and alley was consistent with the fatal shot hitting Moreno in the backyard, from where he ran into the alley and collapsed, later being struck by a vehicle and moved a short distance northward. In sum, the evidence at trial, if believed, was sufficient to support a conviction on the charge of murder and that conviction was not against the manifest weight of the evidence.

{¶ 66} In order to establish the offense of felonious assault, the state was held to prove appellant knowingly caused or attempted to cause physical harm to Dorrell and Pittman by means of a deadly weapon. R.C. 2903.11(A)(2). Rayshawn testified he watched appellant, by means of the security camera, discharge a weapon at the fleeing Pittman and Dorrell after these two fled out the front and back doors respectively. This testimony alone

could support conviction on the felonious assault counts, especially since one of the bullets fired toward the backyard actually struck Moreno, who was fleeing through the same point of egress as Dorrell.

{¶ 67} Finally, with respect to having a weapon while under disability count, the firearm specifications to the other crimes, and the repeat violent offender specifications, the evidence supported appellant's possession of an operable firearm and appellant does not dispute he had a previous conviction for a felony of violence; appellant stipulated to a prior conviction for robbery with specifications.  The judge, as trier of fact, was free to believe the state's witnesses as to the other circumstances regarding appellant's possession and use of a weapon in commission of the crimes, and, therefore, the specifications and weapon under disability counts were supported by the manifest weight of the evidence. Appellant's first and second assignments of error are overruled.

{¶ 68} In conclusion, appellant's convictions were supported by sufficient evidence and not against the manifest weight of the evidence.  Appellant's first and second assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

LUPER SCHUSTER and HORTON, JJ., concur.

––––––––––––