[Cite as *State v. Hughes*, 2019-Ohio-4590.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 18AP-837 |
| v. | : | (C.P.C. No. 17CR-4801) |
| Daiquan T. Hughes, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 7, 2019

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Sheryl L. Prichard,* for appellee.

**On brief:** *Timothy Young,* Ohio Public Defender, and *Victoria Bader,* for appellant.

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1}  Daiquan T. Hughes pleaded guilty to aggravated murder in having shot Brian Woodson to death on Halloween night 2016.  "I hope you can forgive me," he told the sentencing judge.  "I hope God can forgive me."  September 25, 2018 Change of Plea and Sentencing Transcript at 15.  Assisted by counsel and with a gun specification no longer at issue, Mr. Hughes joined with the state in recommending a prison term of 25 years to life, which sentence the court then imposed.  October 1, 2018 Judgment Entry.

{¶ 2}  Mr. Hughes was 17 years old when he committed the murder. *See, e.g.,* Plea Tr. at 9.  On appeal, he submits only one assignment of error, arguing that the juvenile court lacked probable cause on which to bind him over to the common pleas court's general division.  In violation of the Ohio and federal constitutions, he recites, "[t]he juvenile court violated [his] right to due process when it found probable cause to believe that he

committed the alleged offense, in the absence of sufficient, credible identification evidence." Appellant's Brief at 7. Because we accord appropriate deference to the juvenile court's finding that the eyewitness was "very credible" in attesting that Mr. Hughes twice had returned to an already injured Mr. Woodson to shoot him multiple times and that Mr. Hughes then had returned to the victim yet once more to shoot him in the head, and because we find as a matter of law that the juvenile court did not err in concluding that probable cause existed for each element of the offense of murder as then charged, we will overrule the assignment of error and affirm the conviction.

{¶ 3} We dispense at the outset with the state's position that by pleading guilty, Mr. Hughes has waived his probable-cause-based argument that he was denied due process by the bindover proceeding. *See* Appellee's Brief at 4-8. This court recently has reiterated the understanding, shared by a variety of appellate districts across Ohio, that "because a proper bindover procedure, which includes the determination of the existence of probable cause, is necessary to transfer jurisdiction, it cannot be waived," and (to much the same effect) that "because a finding of probable cause based on [assertedly] insufficient evidence [would] contravene[] the procedures established under R.C. 2152.12 for the transfer of jurisdiction to the general division of a common pleas court, we review whether the [juvenile] court's finding of probable cause was based on sufficient evidence." *State v. E.T.*, 10th Dist. No. 17AP-828, 2019-Ohio-1204, ¶ 44-45 (citations omitted). That remains our view of the role the law assigns to us here.

{¶ 4} In conducting that review, "we defer to the trial court's determinations regarding witness credibility, but we review de novo the legal conclusion whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, ¶ 51. "For purposes of finding probable cause * * *, the state need only provide credible evidence that raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt." *State v. E.T.*, 2019-Ohio-1204, ¶ 66, citing *In re A.J.S.* at ¶ 42. We appreciate, therefore, that the juvenile court was charged with assessing witness credibility and determining whether the state presented credible evidence for each element of the offense, but that it was " 'not permitted to exceed the limited scope of the bindover

hearing or to assume the role of the fact-finder at trial.' " *State v. E.T.* at ¶ 32 (citations omitted).

{¶ 5}    The only aspect of probable cause that Mr. Hughes contests in this appeal relates to the eyewitness's identification of him as the shooter:  reliance on "unreliable identification testimony violates due process," he argues, and here the witness's "in-court identification [was under conditions that were] inherently suggestive" and did not arise from circumstances that would tend to support its reliability.  Appellant's Brief at 8, 9, 10-15.  He does not otherwise challenge as deficient evidence for any element of the offense. *Id.*

{¶ 6}    Although Mr. Hughes through counsel says that the eyewitness made "his first identification of Daiquan Hughes as a suspect * * * at Daiquan's probable cause hearing," Appellant's Brief at 2-3, and that his "first-time" identification came "[m]ore than six months" after the event, *id.* at 15, that is not what the transcript of the bindover hearing reflects.  Eyewitness T.B., a 26-year-old employed high school graduate, initially told police that he had not seen what happened ("[b]ecause I was scared"), but "four or five weeks later" he "was ready to * * * talk" and gave his account to police.  May 17, 2017 Transcript of Proceedings at 34, 37, 39 (adding that he was shown photo arrays then).  At that time, according to his testimony, "I talked to * * * the detective.  I told them everything because I seen it all."  *Id.* at 91 .

{¶ 7}    Thus, by his account, T.B.'s courtroom identification of Mr. Hughes (as wearing a "[j]ail uniform," *id.* at 15) was not the first time he had identified Mr. Hughes to authorities as the shooter.  Despite some initial confusion over which actor he was talking about, *see id.* (at first referring to Mr. Hughes by the nickname of another, before averring that he knows Mr. Hughes as "Dai Dai"), the in-court identification suggests no taint or undue suggestiveness with regard to someone T.B. had known "[n]ot too long," but who had been to his apartment and with whom he "used to play [Xbox One] and stuff like that, you know, like kick it."  *Id.* at 16-17.

{¶ 8}    We previously have cited the United States Supreme Court's decision in *Perry v. New Hampshire*, 565 U.S. 228 (2012), for the point that " 'due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary,' " *State v. E.T.*, 2019-Ohio-1204, ¶ 48, quoting *Perry* at 238-39, citing

*Manson v. Brathwaite*, 432 U.S. 98, 107 (1977). We have no particular reason to believe that this case involves impermissibly suggestive identification procedures. We therefore see no reason to reach the second part of the "two-step analysis" Mr. Hughes urges in saying that we "must determine whether 'under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible.' " Appellant's Brief at 8, citing *State v. Johnson*, 163 Ohio App.3d 132 (10th Dist.2005), as citing *United States v. Hill*, 967 F.2d 226, 230 (6th Cir.1992). *Hill* makes clear that the "two-step analysis" Mr. Hughes invokes reaches the second step only "if the defendant proves that the identification procedures were impermissibly suggestive," a predicate that we do not think applies here where the eyewitness testified that he knew and recognized the shooter and that he had relayed "everything" to police. *Compare, e.g., State v. Albert*, 10th Dist. No. 06AP-439, 2006-Ohio-6902, ¶ 45 ("[i]If the defendant does not satisfy his burden to prove that the procedures were suggestive, then the court need not address the likelihood of irreparable misidentification") (citations omitted); *Perry,* 565 U.S. at 223 ("[w]hen no improper law enforcement activity is involved * * * it suffices to test reliability through the rights and opportunities generally designed for that purpose * * *").

{¶ 9} In any event, even apart from our conclusion that Mr. Hughes has not shown the identification process itself to have been tainted, our review of the bindover transcript —which does show sufficient evidence to demonstrate probable cause—reveals no likelihood of misidentification under the totality of the circumstances. Although we do not believe it necessary under state or federal precedents for us to engage in the "step two" reliability review that Mr. Hughes urges, we address his points by way of outlining the direct eyewitness testimony that established probable cause for the juvenile court.

{¶ 10} "In determining whether an identification was unreliable under the totality of the circumstances, a court must consider (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *State v. E.T.*, 2019-Ohio-1204, ¶ 48, citing *State v. Broom,* 40 Ohio St.3d 277, 284 (1988); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

{¶ 11} Eyewitness T.B. told the court that he had known the 42-year-old victim, Brian Woodson, for a few months and had lived across the way from him in the same complex. May 17, 2017 Tr. at 13. He had known Mr. Hughes ("Dai Dai") for "[l]ike a couple months" and only in the company of Mr. Hughes's eventual codefendant Devon, who had on occasion joined Mr. Hughes in T.B.'s apartment to play video games and "kick it." *Id.* at 73, 16-17; *see also id.* at 72 (Q: "you've had him in your place and everything?" A: "Yes").

{¶ 12} T.B. was home with some guests on Halloween evening 2016 when he heard a shot from outside his kitchen window. *Id.* at 26. Looking out, he saw "Dai Dai and Devon chasing Brian." *Id.* at 46. He then heard Brian Woodson screaming for help, and moved to "peek through the blinds" of his living room window. *Id.* at 27-28. "It wasn't close to gettin[g] dark yet," he testified; although "it's getting there * * * * it was still light outside." *Id.* at 48. He saw Mr. Woodson (who he said had run up some steps and fallen to the ground) being beaten by "Devon and Dai Dai." *Id.* at 28-29. "Dai Dai hit Brian with [a] bottle in his head," while Devon "was kicking him" and trying to go through his pockets. *Id.* at 29. Then Devon and Mr. Hughes "took off down the steps." The victim was left calling for help and saying " 'They shot me.' " *Id.* at 30. T.B. testified that he did not leave his apartment because Mr. Hughes had a gun, *id.*, but he called the police, *id.* at 75.

{¶ 13} Mr. Hughes and Devon quickly returned, T.B. testified, *id.* at 30-31: "[t]hat's when they was trying to really kill him; when they came back," *id.* at 77. Indeed, T.B.'s account seems to have been that Mr. Hughes "came back three times." *Id.* at 77 (also affirming that "they came back three times to shoot him"). The first time, the aggressors emptied "the whole round; like six" shots before "[t]hey took off running." *Id.* at 31. Seconds later, after T.B. had opened his door to go out to help, his friends told him they saw the pair coming back again. T.B. "went back to the window" and saw that "Dai Dai's still got the gun * * *. He was shooting [Mr. Woodson] on his body." *Id.* at 31-32. The two then "ran off again," but "Brian was still screaming, and he was holding on." Mr. Hughes "[c]ame back the third time, stood over Brian, * * * * looked at Brian in his face and he shot him in his head. The whole round, six." *Id.* at 33.

{¶ 14} The coroner's report, which details at least 14 bullet wounds, including seven to Mr. Woodson's head and neck area, notes the cause of death as "[g]unshot wounds to the head and trunk." State's Bindover Ex. 1.

{¶ 15} We find no reason to conclude that the juvenile court judge abused her authority in assessing T.B. (the only bindover witness) to be "a very strong witness, a very credible witness." May 17, 2017 Tr. at 104. Having seen his testimony first-hand, including the testimony he gave on cross-examination, the juvenile court judge was " 'in the best position to [gauge] [his] credibility * * * by assessing [his] demeanor * * * and the manner in which [he] testified, [his] connection or relationship with the parties, and [his] interest, if any, in the outcome.' " *State v. E.T.*, 2019-Ohio-1204, ¶ 68, quoting *State v. Powell*, 10th Dist. No. 17AP-808, 2018-Ohio-3944, ¶ 15.

{¶ 16} We find as a matter of law that coupled with the bindover exhibits admitted by agreement, T.B.'s testimony as to each element of the offense "presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged." *Compare, e.g.*, *In re A.J.S.*, 2008-Ohio-5307, ¶ 51. The killer returned to the scene and returned again, in T.B.'s account, to finish off Brian Woodson with multiple gunshots to the head and body, and Mr. Hughes does not contest the elements of purpose or causation. He challenges only T.B.'s identification of him as the shooter.

{¶ 17} But T.B. was unshaken in his insistence that peering through his living room blinds—and even though "taking turns" of five seconds with his guests in watching events unfold—given the adequate lighting and his good vision, he had ample opportunity to observe the acts he described. *See, e.g.,* May 17, 2017 Tr. at 33, 48, 70-71, and 56 ("I could still see outside"). He testified that because of the proximity of his window to the action, "when you looking out the window * * * you still got no choice, but to see them. Like * * * they right there. * * * [T]hat's like me standing outside next to 'em. I can see it --." *Id.* at 79. Moreover, he averred, "how I actually knew that it was him, is when I was looking out my window, he looked at my window, 'cause I guess he was trying to see * * * if anybody was watching * * * but yes, I seen his face * * * * Dai Dai and Devon's face." *Id.* at 50-51. And his senses were not beclouded; he said that he does not drink, or smoke anything. *Id.* at 73.

{¶ 18} The circumstances were such, too, that it is reasonable that T.B. would have recognized immediately the significance of the events and paid keen attention: he first heard and then later saw the gun being fired; he was on friendly terms with the victim Brian Woodson; he had had the assailants into his apartment to play games and relax; and he

recounted that the events did not happen in one instant, but unfolded with Mr. Hughes leaving the victim, returning to inflict more harm, and then twice more leaving and returning to shoot again each time.

{¶ 19} Although that night T.B. denied having witnessed anything ("[b]ecause I was scared"), *id.* at 34, we are given no reason to believe that the account he provided police four or five weeks later (after speaking with the victim's relatives, who were "trying to figure out, what happened"), *id.* at 37, 89-91, diverged in any significant way from the testimony he gave at the bindover hearing some six and a half months after the shooting. Interviewed individually, *id.* at 90, he "told them everything," he later testified, "because I seen it all." *Id.* at 91. *Compare, e.g., Biggers,* 409 U.S. at 201 (lapse of even seven months between rape and confrontation did not undermine witness's good record for reliability). Moreover, Mr. Hughes's assertion that T.B.'s "memory had significantly eroded" by the time of the hearing "because memory decays at an 'exponential' rate" does not even attempt to take into account that T.B. claimed familiarity with Mr. Hughes before these events and therefore was not basing his account on " 'an initial observation' " of someone from the time of the crime. Appellant's Brief at 15.

{¶ 20} And T.B. expressed unwavering certainty in standing by his account: "It's not a story. It's real -- it's real life stuff that's going on. * * * * I seen it all * * * * Yes, I'm telling the truth." May 17, 2017 Tr. at 86, 91, 97.

{¶ 21} The juvenile court did not err in finding the probable cause required for bindover to the general division of the common pleas court. We overrule Mr. Hughes's single assignment of error and affirm the judgment of the Franklin County Court of Common Pleas that convicted him of aggravated murder.

*Judgment affirmed.*

KLATT, P.J. and LUPER SCHUSTER, J., concur.

_____