[Cite as *State v. E.T.*, 2019-Ohio-1204.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 17AP-828 |
| v. | : | (C.P.C. No. 15CR-6021) |
| [E.T., Jr.], | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

_____

D E C I S I O N

Rendered on April 2, 2019
_____

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee. **Argued:** *Valerie Swanson.*

**On brief:** *Timothy Young*, Ohio Public Defender, and *Timothy B. Hackett*, for appellant. **Argued:** *Timothy B. Hackett.*
_____

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, E.T., Jr., appeals the October 25, 2017 decision of the Franklin County Court of Common Pleas. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} This matter arises out the homicide of Jaurice Blakely which occurred on or about the late evening of January 12, 2015 to the early morning hours of January 13, 2015 at Players Family Billiards ("pool hall") in Franklin County.

{¶ 3} On January 14, 2015, a complaint of delinquency was filed in the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch ("juvenile court"). The complaint charged appellant with the offense of murder, in violation of R.C.

2903.02(A), an unclassified felony.  On January 22, 2015, the juvenile court filed an order amending the complaint to include a firearm specification pursuant to R.C. 2941.145.

{¶ 4}  On January 22, 2015, plaintiff-appellee, State of Ohio, filed a motion to relinquish jurisdiction pursuant to R.C. 2152.12(B) and Juv.R. 30 and transfer the cause to the Franklin County Court of Common Pleas, General Division ("trial court").  On the same date, an entry was filed in the juvenile court notifying appellant that proceedings would occur to determine whether the court's jurisdiction would be relinquished and the case transferred to a court having jurisdiction over the matter.  Appellant's counsel signed the entry acknowledging notification on behalf of appellant and appellant's parent, guardian, or custodian.  On February 10, 2015, the juvenile court filed an entry accepting the stipulations of the parties, finding that all parties had been properly served with the January 22, 2015 motion to relinquish jurisdiction, and finding appellant was 14 years of age at the time of the alleged offense.

{¶ 5}  On July 15, 2015, the juvenile court held a probable cause hearing on the motion to relinquish jurisdiction.  At the hearing, Ralph Rickels, a detective of the Whitehall Division of Police, testified he investigated a homicide at the pool hall between January 12 and 13, 2015.  Rickels testified he obtained surveillance video from the pool hall.

{¶ 6}  John Dickey, a detective of the Whitehall Division of Police, testified he responded to the report of a homicide at the pool hall after midnight on January 13, 2015.  Dickey testified that when he reviewed the surveillance video from the pool hall, he observed a male who appeared to be firing a gun at a vehicle outside the pool hall.  After locating the vehicle, Dickey found a bullet hole in the left front quarter panel of the vehicle as well as two bullet holes in the hood.  Dickey spoke with the vehicle's owner, Layshonda Quintero, who stated that she and MarQeal Fox were present at the pool hall on the night of the incident.

{¶ 7}  Mark Hopper, a detective of the Whitehall Division of Police, testified he investigated the incident in question.  Hopper testified he recovered three shell casings and two bullets from inside the pool hall and five shell casings were recovered outside the pool hall.

{¶ 8}  James Reichgott testified that on January 12, 2015, he was working at the pool hall until between 8:00 and 9:00 p.m. when his shift ended.  After he finished his shift,

he joined some friends at the pool hall to watch Ohio State play in the college football national championship game. Between 12:15 and 12:30 a.m. on January 13, 2015, after he finished watching the game, he was preparing to leave when a fight started. According to Reichgott, two men were involved in the fight, including a "black male with light complexion * * * who was approximately 5'7", 170 pounds" and another man "who was also 5'7", 170 pounds with an afro style haircut." (July 15, 2015 Tr. at 66-67.) He also observed two women involved with the situation, but did not recall whether they were fighting.

{¶ 9} Reichgott observed the fight as it moved from one pool table to another in the pool hall until he heard someone say, "[H]e's got a gun." (July 15, 2015 Tr. at 63.) Reichgott then sustained a gunshot wound to his right leg and fell to the ground. He heard between three and four gunshots, but did not see the person who shot him. Reichgott observed another man on the floor by the door to the patio. Reichgott was rushed to the hospital where he received treatment for his injury. He missed two months of work and now has arthritis in his leg.

{¶ 10} Shakil Gardner testified that on the evening of January 12, 2015, he went to watch the national championship game at the pool hall with his girlfriend and other friends, including Jaurice Blakely. While there, Gardner played pool and drank beer and liquor.

{¶ 11} During his game of pool, Gardner observed a man walk past him and give him "a certain type of look." (July 15, 2015 Tr. at 117.) Gardner looked back at the man for about two to three seconds until the man asked Gardner whether he remembered him. When Gardner replied in the negative, the man stated something about going to middle school together. Gardner replied that he did not remember the man. Eventually the man walked away and Gardner resumed playing pool.

{¶ 12} Gardner's friends asked what the exchange between Gardner and the man had concerned. Gardner replied that he believed the man was upset that Gardner did not remember him. Gardner observed that the man had walked to another group of people who were staring at him and pointing.

{¶ 13} Gardner and Blakely went to the bar together and observed that two men, one in red with long dreadlocks and another who was tall and wearing a red hat, were staring at them. After Gardner and Blakely left the bar area and resumed playing pool, they were approached by the two men who were staring at them at the bar. Gardner and Blakely

exchanged words with the two men and followed them outside, believing that they wanted to fight. The two men denied wanting to fight and walked to a vehicle. Gardner thought the two men had a gun in the car, so he told Blakely to end the situation and return inside.

{¶ 14} Gardner and Blakely returned inside and confronted the first person who approached Gardner. Gardner tried to calm everyone down and resumed playing pool. At some later point, Gardner returned to the bar when he heard that a fight had started. Gardner walked toward the fight, observing a lot of wrestling and commotion, but was unable to see his friend. Gardner testified that as he was walking toward the fight:

> I see like a gun -- before I even see the person's face or anything, I see somebody like this holding a gun, like -- like in their waistband or their pocket. That's when like I -- I like I paused in my stepping and looking and I am just steadily watching the gun, I'm like I'm still trying to look for my friend at the same time. So I'm trying to tell * * * him * * * somebody got a gun you feel me, like they wrestling. Then the -- the wrestling stopped like I'm thinking everybody see the gun, people trying to get ready to get to leave; that's when I -- I lose sight of him again [because] I'm * * * trying to look and see where everybody at. And then another -- another scuffle break out and as soon as that scuffle break out, I hear gun shots.

(July 15, 2015 Tr. at 120-21.)

{¶ 15} Immediately after hearing the shots, Gardner ran out of the building. As he ran away from the building, about halfway across the street, he "started hearing the gun shots and I stopped and turned back around and seen somebody holding -- pointing a gun towards me." (July 15, 2015 Tr. at 121-22.) Gardner stated, "I stopped and looked back. Like seeing somebody, I mean, it was dark, but I seen the same person who I seen inside with the gun and then I kept running." (July 15, 2015 Tr. at 108.) Gardner testified that the person who was pointing the gun at him was "the same person with the same clothes the same everything" as the person he saw inside with the gun. (July 15, 2015 Tr. at 108.) He resumed running until he found his friends and got in a car with them.

{¶ 16} Approximately one week after the incident, Gardner was called to speak to a detective and view a photo array. Before viewing the photo array, Gardner spoke with the detective about the incident. Gardner stated the shooter was wearing a hooded sweatshirt and a toboggan. Gardner also viewed a video of the incident, but he could not recall whether he viewed the video before the photo array.

{¶ 17} The detective placed the photo array in front of Gardner, stated the photos were in no particular order, and asked whether he saw the person with the gun. Gardner testified the photo array consisted of six pictures on a single sheet of paper, three in one row on the top, and three in another row below that. Gardner testified that after viewing the photo array, he stated:

> I told him like I can't say a hundred percent that I seen him based off of these pictures. And he said if you -- if you had to -- if you think you seen -- do -- he said is any of them close to it? I pointed at this picture like yeah, I say, I mean it kind of looked like him, but to me like a lot of the people in the picture look a like and the person had on a hoodie. And then * * * I said I can't really tell off of like basically a 2D portrait of it. And he said if you have to say a percentage what would you say? I said I said it was like 50-50 for real.

(July 15, 2015 Tr. at 110.)

{¶ 18} On cross-examination, appellant's counsel showed Gardner the photo array and engaged in the following dialogue:

> [Appellant's Counsel]: And do you recall telling him that * * * you could eliminate five photos, but you were only about 50 [percent] sure that that was him, correct?
>
> [Gardner]: Yeah.
>
> [Appellant's Counsel]: And that person who you identify as him is this individual right here, correct?
>
> [Gardner]: I mean, yeah. I don't know is it, I mean, it's a picture of -- they look alike, but like I said it's different from me seeing a picture and as in real life like as me seeing the person again like a 3D, you know what I am saying?
>
> [Appellant's Counsel]: I don't know what you're saying. You know that that person you circled is this individual, correct.
>
> [Gardner]: Yeah. It looked like him.
>
> [Appellant's Counsel]: Okay. You know it's him, correct? And this was seven days after the shooting, correct?
>
> [Gardner]: Yeah.
>
> [Appellant's Counsel]: And then seven days after the shooting you were only 50 [percent] sure that's him, right?
>
> [Gardner]: Fifty percent sure that this picture, yeah.

(July 15, 2015 Tr. at 111-12.)

{¶ 19} At the hearing, Gardner identified appellant in the courtroom as the person he saw with a gun at the pool hall on the night of the incident. Gardner stated that he was within five to six feet of the shooter before the shooting occurred.

{¶ 20} John Grebb, a sergeant in the detective bureau of the Whitehall Division of Police, testified that he was assigned to investigate Blakely's homicide. On January 15, 2015, Grebb produced the photo array that was shown to Gardner. Grebb testified Gardner circled one photo on the array, which was appellant's photo. The photo in question was taken in late 2013, making it one and one-half years old at the time it was shown to Gardner.

{¶ 21} Grebb testified he did not personally show the photo array to Gardner, but instead employed a blind administrator. Grebb testified he did not use a folder system, but stated that "the person that showed the photo array had not seen the suspect's photo at all. They don't know anything about it." (July 15, 2015 Tr. at 130.) Grebb stated that "Gardner did not give a description of the suspect to me. The lineup was prepared prior, you know, it was a lineup that was prepared for use in the investigation." (July 15, 2015 Tr. at 133.) Grebb testified he "was not present in the room or in line of sight or any other manner to [Gardner] when he viewed [the photo array]." (July 15, 2015 Tr. at 135-36.)

{¶ 22} On July 30, 2015, the juvenile court filed a judgment entry finding there was probable cause to believe appellant committed the alleged offense. In preparation for a hearing to determine amenability to rehabilitation within the juvenile justice system, the juvenile court ordered a social investigation and mental examination of appellant.

{¶ 23} On November 23, 2015, the juvenile court held an amenability hearing. On December 1, 2015, the juvenile court filed an entry sustaining the state's January 22, 2015 motion to relinquish jurisdiction. On December 8, 2015, the juvenile court filed a judgment entry ordering the relinquishment of jurisdiction over the matter and the transfer of the matter to the trial court.

{¶ 24} On December 11, 2015, an indictment was filed in the trial court charging appellant with 13 criminal counts: one count of aggravated murder, in violation of R.C. 2903.01, an unclassified felony; two counts of murder, in violation of R.C. 2903.02, unclassified felonies; four counts of felonious assault, in violation of R.C. 2903.11, felonies of the second degree; four counts of attempted murder, in violation of R.C. 2923.02 and 2903.02, felonies of the first degree; one count of carrying a concealed weapon, in violation

of R.C. 2923.12, a felony of the fourth degree; and one count of having weapons while under disability, in violation of R.C. 2923.13, a felony of the third degree. All counts, except for the count of carrying a concealed weapon and the count of having weapons while under disability, contained an attached three-year firearm specification.

{¶ 25} On July 14, 2017, the trial court held a plea hearing. The same day, the trial court filed an entry reflecting that appellant entered a plea of guilty to two criminal counts: voluntary manslaughter, in violation of R.C. 2903.03, a felony of the first degree; and felonious assault, in violation of R.C. 2903.11, a felony of the second degree. Both counts contained an attached three-year firearm specification.

{¶ 26} On October 19, 2017, the trial court held a sentencing hearing. On October 25, 2017, the trial court filed a judgment entry reflecting appellant's convictions, pursuant to a plea of guilty, and imposing the following sentence: 10 years for the count of voluntary manslaughter in addition to a mandatory, consecutive 3 years as to the firearm specification; and 4 years for the count of felonious assault in addition to a mandatory, consecutive 3 years as to the firearm specification. The court ordered both counts to run consecutive to each other and consecutive to each of the firearm specifications for a total period of incarceration of 20 years. The court also imposed a period of post-release control of up to 5 years.

## II. Assignments of Error

{¶ 27} Appellant appeals and assigns the following three assignments of error:

I. The Franklin County Juvenile Court violated [appellant's] right to due process of law, when it based its probable cause determination on a vague, uncertain, and unreliable eyewitness identification, in violation of the Fifth and Fourteenth Amendments to the United States Constitution; and, Article I, Section 16 of the Ohio Constitution.

II. [Appellant] was deprived of his right to the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution; and, Article I, Section 10 of the Ohio Constitution.

III. The Franklin County Juvenile Court violated [appellant's] right to due process of law, because its probable cause determination was not supported by sufficient, reliable, and credible evidence, in violation of the Fifth and Fourteenth

Amendments to the U.S. Constitution, and Article I, Section 16 of the Ohio Constitution.

{¶ 28} For ease of discussion, we consider appellant's assignments of error out of order.

## III.  First and Third Assignments of Error—Probable Cause Determination

{¶ 29} In his first and third assignments of error, appellant asserts that the juvenile court erred by finding probable cause existed in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution. Specifically, appellant contends the trial court's probable cause determination was erroneous because it was based on an unreliable eyewitness identification and, therefore, was not supported by sufficient, reliable, and credible evidence.  The state responds appellant waived the right to challenge the juvenile court's probable cause determination by pleading guilty in the trial court. Before proceeding to our analysis of the question presented by appellant's first and third assignments of error, we begin by outlining the relevant statutory and constitutional framework underlying the process of transferring a juvenile to an adult common pleas court.

## A.  Applicable Law

### 1.  Jurisdiction of Juvenile Courts

{¶ 30} Pursuant to Article IV, Section 4(B) of the Ohio Constitution, the subject-matter jurisdiction of the courts of common pleas and the divisions of those courts is defined by statute.  *State v. Wilson*, 73 Ohio St.3d 40, 42 (1995).  R.C. 2151.23 provides the jurisdiction of juvenile courts, including the "exclusive jurisdiction over children alleged to be delinquent for committing acts that would constitute a crime if committed by an adult." *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, ¶ 11, citing R.C. 2151.23(A).  The General Assembly, however, enacted R.C. 2152.10 and 2151.12, which "creat[e] 'a narrow exception to the general rule that juvenile courts have exclusive subject matter jurisdiction over any case involving a child.' " *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, ¶ 2, quoting *Wilson* at 43.  R.C. 2151.10 and 2151.12, in conjunction with Juv.R. 30, provide for the mandatory or discretionary "transfer [of] a case involving an alleged delinquent child to the court that would have had jurisdiction of the offense if it had been committed by an adult" in what is commonly referred to as a "bindover procedure."  *Wilson* at 43.

## 2. **Bindover Procedure**

{¶ 31} "When the state requests a discretionary bindover, the juvenile court is * * * [required] to determine the age of the child and whether probable cause exists to believe that the juvenile committed the act charged." *In re M.P.* at ¶ 12, citing R.C. 2152.10(B) and 2152.12(B)(1) and (2). The juvenile court must also order an "investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation." R.C. 2152.12(C). *See* Juv.R. 30(C). The court must then hold a hearing, considering the factors listed in R.C. 2152.12(D) and (E), to determine whether the child is " 'amenable to care or rehabilitation within the juvenile system' or whether 'the safety of the community may require that the child be subject to adult sanctions.' " *In re M.P.* at ¶ 12, quoting R.C. 2152.12(B)(3).

## 3. **Probable Cause in Bindover Proceeding**

{¶ 32} In order to establish probable cause at a bindover hearing, " '[t]he state must provide credible evidence of every element of an offense * * * that raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt.' " *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, ¶ 42, quoting *State v. Iacona*, 93 Ohio St.3d 83, 93 (2001). *See In re D.T.F.*, 10th Dist. No. 05AP-03, 2005-Ohio-5245, ¶ 12. In its determination on the existence of probable cause, " 'the juvenile court must evaluate the quality of the evidence presented by the state in support of probable cause *as well as* any evidence presented by the respondent that attacks probable cause.' " (Emphasis sic.) *In re A.J.S.* at ¶ 43, quoting *Iacona* at 93, citing *Kent v. United States*, 383 U.S. 541 (1966). "The juvenile court has the duty to assess the credibility of the evidence and to determine whether the state has presented credible evidence going to each element of the charged offense, but it is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the fact-finder at trial." *In re D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, ¶ 10, citing *In re A.J.S.* at ¶ 44.

{¶ 33} "Because the issue whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the act charged is a question of law, an appellate court applies a de novo review." *In re M.P.* at ¶ 13, citing *In re A.J.S.* at ¶ 47, 51. *See In re D.T.F.* at ¶ 14.

### 4. Due Process in Juvenile Bindover Proceedings

{¶ 34} "Due-process rights are applicable to juveniles through the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution." *Aalim* at ¶ 23, citing *In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, ¶ 79, citing *In re Gault*, 387 U.S. 1, 41 (1967). The Supreme Court of Ohio has stated that "in the context of a juvenile-court proceeding, the term 'due process' ' "expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty." ' " *Id.*, quoting *In re C.S.* at ¶ 80, quoting *Lassiter v. Dept. of Social Servs. of Durham Cty., North Carolina*, 452 U.S. 18, 24-25 (1981). Based upon the circumstances of a case, "[a] court's task is to ascertain what process is due * * * while being true to the core concept of due process in a juvenile case—to ensure orderliness and fairness." *In re C.S.* at ¶ 81, citing *McKeiver v. Pennsylvania*, 403 U.S. 528, 541 (1971) (plurality opinion).

{¶ 35} The Supreme Court of Ohio, echoing precedent set by the Supreme Court of the United States, has previously examined the scope of due process protections in the juvenile bindover process, stating that the transfer from juvenile court should not occur " 'without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons.' " *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, ¶ 20, quoting *Kent* at 554. A "bindover hearing is a 'critically important proceeding' and that the hearing 'must measure up to the essentials of due process and fair treatment.' " *In re D.M.* at ¶ 11, quoting *Kent* at 562. *See D.W.* at ¶ 20 ("The safeguard of a hearing is contained in the Revised Code and Rules of Juvenile Procedure, and it is grounded in due process and other constitutional protections."); *Aalim* at ¶ 25.

{¶ 36} Having set forth the statutory and constitutional framework underlying the bindover process, we examine precedent concerning waiver resulting from the entry of a guilty plea.

## B. Whether Appellant's Guilty Plea Waived Challenge to Probable Cause

{¶ 37} Generally, " ' if a defendant enters a guilty plea, such plea acts as a waiver of an individual's right to raise most issues on appeal.' " *State v. Armstrong*, 10th Dist. No. 16AP-410, 2017-Ohio-8715, ¶ 8, quoting *State v. Benman*, 10th Dist. No. 03AP-1012, 2004-Ohio-3935, ¶ 12. " '[A] guilty plea * * * renders irrelevant those constitutional violations

not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction if factual guilt is validly established.' " *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, ¶ 78, quoting *Menna v. New York*, 423 U.S. 61, 62 (1975), fn. 2. "A guilty plea nonetheless waives the right to assert ineffective assistance of counsel unless the counsel's errors affected the knowing and voluntary nature of the plea." *State v. McMichael*, 10th Dist. No. 11AP-1042, 2012-Ohio-3166, ¶ 14, citing *State v. Hill*, 10th Dist. No. 10AP-634, 2011-Ohio-2869, ¶ 15, citing *State v. Spates*, 64 Ohio St.3d 269, 272 (1992). However, "[t]he issue of a court's subject matter jurisdiction cannot be waived." *Wilson* at 46. *See Ross v. Common Pleas Court of Auglaize Cty.*, 30 Ohio St.2d 323, 323-24 (1972), quoting *Crockett v. Haskins*, 372 F.2d 475, 476 (6th Cir.1966) ("A defendant who enters a voluntary plea of guilty while represented by competent counsel waives all nonjurisdictional defects in prior stages of the proceedings.").

{¶ 38} In *Wilson*, the Supreme Court of Ohio considered whether the general division of a common pleas court had jurisdiction to convict a juvenile who had previously not been subject to a bindover proceeding in a juvenile court. The court held that "absent a proper bindover procedure * * * the juvenile court has the exclusive subject matter jurisdiction over any case concerning a child who is alleged to be a delinquent" and that such jurisdiction "cannot be waived." *Wilson* at 44, 46. Accordingly, the Supreme Court concluded that because Wilson had not been subject to a proper bindover procedure, the general division of the court of common pleas lacked jurisdiction over Wilson, rendering the judgment of conviction void ab initio.

{¶ 39} Following *Wilson*, the Supreme Court of Ohio has found that a juvenile may waive nonjurisdictional issues not raised during the bindover proceeding. In *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, the Supreme Court found that a juvenile forfeited challenges to the constitutionality of the statutes providing for mandatory bindover procedures because he failed to object in either the juvenile court or the general division of the common pleas court.

{¶ 40} In *State v. Martin*, ___ Ohio St.3d ___, 2018-Ohio-3226, the Supreme Court considered whether the plain error standard of review applied when, in a bindover proceeding, a juvenile did not object to the failure of the juvenile court to consider and apply Ohio's "safe harbor" law under R.C. 2152.021. In that case, the state argued that "when a

defendant enters a guilty plea in adult court, she [or he] can appeal only the juvenile court's probable-cause and amenability findings and that she [or he] cannot appeal based on alleged procedural defects that she [or he] did not raise in those proceedings." *Id.* at ¶ 16.

{¶ 41} While noting its holding in *Wilson*, the court observed that "Martin was not deprived of R.C. 2152.12 bindover proceedings altogether, and she does not argue that the court's amenability ruling was erroneous." *Id.* at ¶ 25. Because the safe harbor law's "mandates are not jurisdictional requirements," the court found that "when a juvenile court has failed to consider the applicability of [the safe harbor law] and no objection was raised in the juvenile court, plain-error analysis applies." *Id.* at ¶ 27, citing *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565.

{¶ 42} Here, the state, relying on *Quarterman*, asserts that "not every error in a bindover proceeding [is] 'jurisdictional.' " (State's Brief at 17.) The state contends that appellant's "claim is not a jurisdictional error," but rather that the juvenile court "committed a legal error by relying on insufficient evidence to find that probable cause existed." (Emphasis omitted.) (State's Brief at 19, citing *In re A.J.S* at ¶ 51.) While we agree with the state that nonjurisdictional defects are generally waived by entering a guilty plea, we do not find such statement to be determinative of the question presented.

{¶ 43} Prior to ordering a discretionary bindover, a juvenile court must find "[t]here is probable cause to believe that the child committed the act charged." R.C. 2152.12(B)(2). We have previously stated that "[w]here a juvenile court purports to transfer a juvenile case to adult court without having complied with the proper procedures in R.C. 2152.12, the adult court proceeds in the absence of subject-matter jurisdiction, and any judgment entered by the adult court is a nullity and void ab initio." *State v. J.T.S.*, 10th Dist. No. 14AP-516, 2015-Ohio-1103, ¶ 11; *State v. Brown*, 10th Dist. No. 13AP-349, 2014-Ohio-314, ¶ 29, citing *Wilson* at 44. In *J.T.S.*, a juvenile, who entered a plea of guilty after the transfer of the case to the general division of the common pleas court, challenged the juvenile court's acceptance of his stipulation to the existence of probable cause. We reviewed the claim and found that the juvenile court did not err when it determined that the juvenile's stipulation as to the existence of probable cause was a knowing, intelligent, and voluntary waiver of the right to a probable cause hearing.

{¶ 44} Here, unlike in *J.T.S.*, the trial court entered its finding on the existence of probable cause following a hearing. However, the jurisdictional requirement of a proper bindover procedure is the same in both cases. Just as the jurisdictional requirements of R.C. 2152.12 would not be met by a bindover proceeding in which the juvenile court accepted a stipulation to the existence of probable cause without a knowing, intelligent, and voluntary waiver of the right to a hearing, so too would the requirements not be met by a bindover proceeding in which the juvenile court found the existence of probable cause based on insufficient evidence. *In re D.M.* at ¶ 10, citing *In re A.J.S.* at ¶ 44 (stating that in determining the existence of probable cause, it is the duty of the juvenile court to "assess the credibility of the evidence and to determine whether the state has presented credible evidence going to each element of the charged offense"). In either case, because a proper bindover procedure, which includes the determination of the existence of probable cause, is necessary to transfer jurisdiction, it cannot be waived. *Wilson* at 46.

{¶ 45} Consistent with our reasoning, other Ohio appellate courts have reviewed challenges to the probable cause determination of a juvenile court from juveniles who entered guilty pleas in the general division of a common pleas court in assessing whether the jurisdictional requirements of the bindover process were met. *State v. Kitchen*, 5th Dist. No. 02CA056, 2003-Ohio-5017, ¶ 80 (holding, after guilty plea in adult court, that juvenile court did not err in "finding of probable cause to believe appellant committed both offenses alleged" and therefore finding juvenile "court's relinquishment of jurisdiction proper pursuant to R.C. 2152.12"); *State v. Mays*, 8th Dist. No. 100265, 2014-Ohio-3815, ¶ 16-29; *State v. Legg*, 4th Dist. No. 14CA23, 2016-Ohio-801, ¶ 31 (considering "claim that the state did not present sufficient evidence to establish probable cause to believe that he committed the acts charged in the delinquency complaints" despite guilty plea). Therefore, because a finding of probable cause based on insufficient evidence contravenes the procedures established under R.C. 2152.12 for the transfer of jurisdiction to the general division of a common pleas court, we review whether the trial court's finding of probable cause was based on sufficient evidence.

## C. Probable Cause Determination

{¶ 46} Appellant asserts that the juvenile court erred in considering evidence related to his identification because it is vague, uncertain, and unreliable. Furthermore, appellant

contends that because of the flaws in the identification, the probable cause determination is not supported by sufficient, reliable, and credible evidence.

### 1. Whether Identification Was Unnecessarily Suggestive and Unreliable

{¶ 47} " 'The rationale for excluding a tainted pretrial identification is to protect the defendant from misconduct by the state.' " *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 19, quoting *State v. Brown*, 38 Ohio St.3d 305, 310 (1988). When a witness has been confronted with a suspect prior to trial, a court must suppress witness's identification of the suspect " ' "if the confrontation was unnecessarily suggestive of the suspect's guilt *and* the identification was unreliable under all the circumstances." ' " (Emphasis sic.) *Gross* at ¶ 19, quoting *State v. Murphy*, 91 Ohio St.3d 516, 534 (2001), quoting *State v. Waddy*, 63 Ohio St.3d 424, 438 (1992).

{¶ 48} The Supreme Court of the United States has characterized confrontations unnecessarily suggestive of the suspect's guilt as those confrontations "infected by improper police influence" resulting in a "corrupting effect" on the identification process. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id.* at 238-39, citing *Manson v. Brathwaite*, 432 U.S. 98, 107, 109 (1977). In determining whether an identification was unreliable under the totality of the circumstances, a court must consider (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *State v. Broom*, 40 Ohio St.3d 277, 284 (1988), citing *Manson* at 114. *See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

{¶ 49} R.C. 2933.83(B) " 'requires any law enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt specific procedures for conducting the lineups.' " *State v. Montgomery*, 10th Dist. No. 13AP-512, 2014-Ohio-4354, ¶ 40, fn. 3, quoting *State v. Ruff*, 1st Dist. No. C-110250, 2012-Ohio-1910, ¶ 5. The purpose of R.C. 2933.83 is to "prevent the use of 'unnecessarily suggestive procedures.' " *Id.*, quoting *State v. Howard*, 8th Dist. No. 100094, 2014-Ohio-2176, ¶ 18.

{¶ 50} R.C. 2933.83(B) provides that the procedures used in conducting a photo lineup must at a minimum meet the following requirements:

> (1) Unless impracticable, a blind or blinded administrator shall conduct the live lineup or photo lineup.
>
> (2) When it is impracticable for a blind administrator to conduct the live lineup or photo lineup, the administrator shall state in writing the reason for that impracticability.
>
> (3) When it is impracticable for either a blind or blinded administrator to conduct the live lineup or photo lineup, the administrator shall state in writing the reason for that impracticability.
>
> (4) The administrator conducting the lineup shall make a written record that includes all of the following information:
>
> (a) All identification and nonidentification results obtained during the lineup, signed by the eyewitnesses, including the eyewitnesses' confidence statements made immediately at the time of the identification;
>
> (b) The names of all persons present at the lineup;
>
> (c) The date and time of the lineup;
>
> (d) Any eyewitness identification of one or more fillers in the lineup;
>
> (e) The names of the lineup members and other relevant identifying information, and the sources of all photographs or persons used in the lineup.
>
> (5) If a blind administrator is conducting the live lineup or the photo lineup, the administrator shall inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know who the suspect is.

Under R.C. 2933.83(A)(2), a "blind administrator" is a person conducting a photo lineup who "does not know the identity of the suspect" and "includes an administrator who conducts a photo lineup through the use of a folder system or substantially similar system." Under R.C. 2933.83(A)(3), a "blinded administrator" is a person conducting a photo lineup who "may know who the suspect is, but does not know which lineup member is being viewed by the eyewitness" and "includes an administrator who conducts a photo lineup through the use of a folder system or substantially similar system." R.C. 2933.83(A)(6) defines the "folder system" for purposes of R.C. 2933.83, requiring that the system satisfy a number of conditions including that the "investigating officer uses one 'suspect

photograph' that resembles the description of the suspected perpetrator of the offense provided by the eyewitness." R.C. 2933.83(A)(6)(a).

{¶ 51} R.C. 2933.83(C) governs procedures relating to a failure to comply with the provisions of R.C. 2933.83(B), including procedures related to a motion to suppress, a claim of eyewitness misidentification, and jury instructions at trial.[1] Pursuant to R.C. 2933.83(C)(1), "[e]vidence of a failure to comply with any of the provisions of this section or with any procedure for conducting lineups that has been adopted by a law enforcement agency or criminal justice agency pursuant to division (B) of this section and that conforms to any provision of divisions (B)(1) to (5) of this section shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup."

{¶ 52} Although R.C. 2933.83(C)(1) requires a court to consider evidence of a failure to comply with the requirements detailed in R.C. 2933.83(B), it does not mandate suppression for such a failure. *State v. Young*, 10th Dist. No. 15AP-1144, 2017-Ohio-9028, ¶ 35. The provisions of R.C. 2933.83 do " 'not provide an independent basis upon which to suppress evidence, and a trial court errs in solely relying on the statute in suppressing an identification.' " *State v. Wells*, 8th Dist. No. 98388, 2013-Ohio-3722, ¶ 84, quoting *State v. Sails*, 2d Dist. No. 24733, 2012-Ohio-4453, ¶ 30. *See State v. Matthews*, 12th Dist. No. CA2012-09-175, 2013-Ohio-3482, ¶ 28; *State v. Jackson*, 4th Dist. No. 11CA20, 2012-Ohio-6276, ¶ 25 (stating that the "failure to comply with R.C. 2933.83 does not, by itself, warrant the suppression of evidence"); *State v. Parks*, 7th Dist. No. 11 CO 20, 2012-Ohio-3010, ¶ 17 (finding that R.C. 2933.83 "does not provide for automatic exclusion of a line-up conducted in a manner different than that provided thereunder"). " 'The overriding analysis remains whether the procedure was "impermissibly suggestive." ' " *Wells* at ¶ 84, quoting *State v. Henry*, 6th Dist. No. L-11-1157, 2012-Ohio-5552, ¶ 46, quoting *Biggers* at 197.

{¶ 53} After the conclusion of testimony at the probable cause hearing, appellant's counsel made the following arguments to the juvenile court:

> Quite frankly, Your Honor, I've not actually seen a weaker case with regard to probable cause in my life. This case clearly just comes down to ID whether or not it was [appellant] who did

---

[1] We note that the provisions of R.C. 2933.83(C), which govern procedures relating to a failure to comply with the provisions of R.C. 2933.83(B), do not include probable cause hearings in a bindover proceeding.

this alleged or these alleged acts. The * * * witness himself said that he couldn't remember something; his memory wasn't as good as six or seven months later, which is today as it was immediately after this incident happened. And immediately after the -- this incident, happened he said he was only 50 percent sure that this individual was [appellant]. That's simply not enough for probable cause. But certainly, when somebody comes in [whose] best friend had just been killed * * * there's only one person to identify. I think the Court needs to look back to say okay, what was identification back then when this incident happened and clearly there's simply not enough of probable cause. Along those lines there is simply Your Honor, no physical evidence either whatsoever. They can't attribute a gun to my client. They can't attribute the bullets to my client. They can't attribute the outfit he was wearing to my client. There's absolutely zero physical evidence and clearly the case just relies on the testimony of Mr. Gardner, who again at the time said he was only 50 percent sure that this is the person after he had looked at the video, after he had seen the news coverage on -- on TV at the -- when this happened. So I just clearly think, Your Honor, this is a case of -- there's just simply not probable cause to believe that [appellant] did this.

(July 15, 2015 Tr. at 141-42.)

{¶ 54} Following arguments by counsel, the juvenile court made the following statement:

[P]robable cause is a way lower standard [than] beyond a reasonable doubt. And I agree there's nothing on there that you would look at and know. So we're basing the entire case on [Gardner's] identification, which isn't particularly strong, but it isn't. All I have to get is do I have enough to say that someone thinks this is the man that did the shooting at this point and get me to probable cause. But it certainly isn't beyond a reasonable doubt standards, so I -- I agree with some of the things you've said and some of the issues I think you with this lineup. [sic] But you know, I just have to get to did someone ID this man. Whether it's right or wrong I guess will be heard potentially in another -- in another hearing, but I will certainly entertain a cause for release for potentially after I tell you what I'm gonna rule because it is a very low, low threshold that I have to get to and I have a person saying this is the person that was the shooter. Obviously, there's a whole lot more going on in this case that I don't, you know, know about and height comparisons and everything else. But right now, I have

someone saying this is the person and I identified him here, so I think I get to the probable cause level. * * * So for what I have, you know, I think I have to find that [appellant] at least I have, you know, testimony that I get to the point of there is probable cause to believe that he committed four counts of felonious assault and the charge of murder * * * and that I'll find that a probable cause exist to each element of the offense.

(July 15, 2015 Tr. at 144-45.)

### a. *Out-of-Court Identification*

{¶ 55} Appellant asserts a number of arguments to support the claim that the procedure employed in administering the photo array was unnecessarily suggestive. Appellant asserts that the procedure used in administering the photo array failed to comply with R.C. 2933.83 because (1) it was not based on Gardner's description of the suspect; (2) the procedure did not employ the folder system; (3) the procedure did not utilize "double blinded administration"; and (4) there was no evidence the procedure was recorded. Appellant also points to testimony that Gardner viewed the surveillance video of the incident, although the testimony does not conclusively establish whether he viewed the video before or after being shown the photo array.

{¶ 56} First, appellant asserts the photo array failed to comply with R.C. 2933.83 because it was not based on Gardner's description of the suspect. Although Detective Grebb admitted the photo array was not based on a description from Gardner, we have previously found that "[a] photo array which is ' "created by police prior to the victim['s] giving a description of the suspect, * * * is not unreasonably suggestive, as long as the array contains individuals with features similar to the suspect." ' " *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, ¶ 49 (10th Dist.), quoting *State v. Hickman*, 5th Dist. No. 09-CA-15, 2009-Ohio-4911, ¶ 10, quoting *State v. Jones*, 8th Dist. No. 85025, 2005-Ohio-2620, ¶ 15. Appellant does not contend that the other individuals in the photo array did not have sufficiently similar features. The similarity between the photos is supported by Gardner's testimony that "a lot of the people in the picture look alike." (July 15, 2015 Tr. at 110.)

{¶ 57} Second, appellant contends the procedure was rendered unnecessarily suggestive as a result of the failure to employ the folder system outlined in R.C. 2933.83 and because it did not employ "double blinded administration." (Appellant's Brief at 18.) It is undisputed that Grebb did not utilize the folder system, but rather prepared a single

sheet containing all six photos, in two rows of three. We have previously held that the failure to present the photo array using "sequential methods does not make the identification procedure unduly suggestive." *Monford* at ¶ 51. *See State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080, ¶ 49 (10th Dist.).

{¶ 58} R.C. 2933.83 does not define or otherwise mention "double blinded administration." However, we have stated "[w]hen a police agency uses the double blind method, a photo array is shown by a neutral officer without knowledge of who the targeted suspect is so that the officer cannot subconsciously or unintentionally communicate to the witness which photo * * * should [be] select[ed]." *Monford* at ¶ 51. Here, Grebb testified that the person who showed the photo array had not seen the suspect's photo at all. "They don't know anything about it." (July 15, 2015 Tr. at 130.) Furthermore, Grebb testified he "was not present in the room or in line of sight or any other manner to [Gardner] when he viewed [the photo array]." (July 15, 2015 Tr. at 135-36.) Finally, appellant does not contend the administrator of the test influenced him or communicated to him, intentionally or unintentionally, which photo he should select. *See id.* at ¶ 52.

{¶ 59} Third, appellant asserts the procedure violated R.C. 2933.83 because it was not recorded. The record from the probable cause hearing does not reflect whether or not the procedure was recorded. Grebb and Gardner testified and were subject to cross-examination regarding their recollection of the procedure. As a result, we cannot find this serves as a basis for the procedure being unnecessarily suggestive.

{¶ 60} Fourth, appellant contends the procedure was unnecessarily suggestive because Gardner was shown the surveillance video at some point following the incident. Because the record is unclear as to whether Gardner viewed the video before or after the administration of the photo array, we cannot find, under the facts of this case, that his viewing of the video was unnecessarily suggestive.

{¶ 61} Upon review, we find the procedure employed in the administration of the photo array did not strictly comply with the requirements of R.C. 2933.83. However, "[t]he failure to strictly comply with R.C. 2933.83 does not render the pretrial identification procedure per se impermissibly suggestive," but "[r]ather, all facts and circumstances must be considered." *Young* at ¶ 35. Thus, considering the totality of the facts and circumstances in this case, we cannot agree that the police conduct surrounding Gardner's out-of-

court identification was unnecessarily suggestive. [2] Because the photo array was not unnecessarily suggestive, we need not address the reliability of the identification under the totality of the circumstances. *Monford* at ¶ 41; *Gross* at ¶ 19; *State v. Jackson*, 4th Dist. No. 11CA20, 2012-Ohio-6276, ¶ 28, citing *State v. Lewis*, 2d Dist. No. 24271, 2011-Ohio-5967, ¶ 30.

### b. *In-Court Identification*

{¶ 62} In his reply brief, appellant for the first time asserts the identification at the probable cause hearing was admitted in error because it was not based on the witness's reliable, independent recollection. Pursuant to App.R. 16(C), an appellant may file a brief "in reply to the brief of the appellee." "The purpose of a reply brief is to afford the appellant an opportunity to respond to the brief of the appellee, not to raise a new argument for the first time." *Cullinan v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 15AP-390, 2016-Ohio-1083, ¶ 19. *See State v. Mitchell*, 10th Dist. No. 10AP-756, 2011-Ohio-3818, ¶ 47 ("A reply brief affords an appellant an opportunity to respond to an appellee's brief, * * * and it is improper to use it to raise a new issue."); *State ex. rel. Bryant v. Meyer Co.*, 10th Dist. No. 07AP-731, 2008-Ohio-3292, ¶ 5; *State v. Newcomb*, 10th Dist. No. 04AP-1223, 2005-Ohio-4570, ¶ 29. We "generally will not consider a new issue presented for the first time in a reply brief." *Hunter v. Shield*, 10th Dist. No. 17AP-751, 2018-Ohio-2371, ¶ 23, quoting *Quarterman* at ¶ 18. *See Cullinan* at ¶ 19, citing *State v. Shedwick*, 10th Dist. No. 11AP-709, 2012-Ohio-2270, ¶ 50. Thus, because appellant failed to raise the issue of the reliability of the in-court identification in his merit brief, we need not address it.

{¶ 63} Nevertheless, even if we were to consider the arguments appellant raises in his reply brief related to Gardner's identification of appellant at the probable cause hearing, we would find them to be meritless. In support of his contention that the identification at the probable cause hearing was in error, appellant asserts the juvenile court erred because it failed to ascertain whether Gardner's identification of appellant at the hearing was based on "independent recollection of the suspect or on his memory of the photo array alone."

---

[2] We note that the provisions of R.C. 2933.83 apply to "any law enforcement agency or criminal justice entity in this state that conducts live lineups or photo lineups" and create "minimum" requirements for procedures conducting lineups. R.C. 2933.83(B). We caution that under different facts, a failure to comply with the statutory requirements under the totality of the circumstances may result in suppression of eyewitness identification.

(Emphasis omitted.) (Appellant's Reply Brief at 8.) However, none of the cases cited by appellant require a trial court to ascertain the reliability of an in-court identification where there has been no prior unlawful or unnecessarily suggestive police conduct. *See United States v. Wade*, 388 U.S. 218 (1967) (vacating conviction and remanding for hearing on whether identification resulted from independent recollection where defendant's right to counsel at postindictment lineup was violated); *United States v. Crews*, 445 U.S. 463, 473 (1980) (finding that "victim's capacity to identify her assailant in court neither resulted from nor was biased by the unlawful police conduct committed long after she had developed that capacity"); *State v. Jackson*, 26 Ohio St.2d 74, 77 (1971) ("In determining whether the in-court identification was a result of an improper line-up or came from some independent recollection and observation of the accused by the witness, * * * the totality of the circumstances surrounding the identification must be considered."); *State v. Hogan*, 10th Dist. No. 09AP-1182, 2010-Ohio-3385, ¶ 25 (remanding for the trial court to consider whether identification was based on reliable, independent recollection where the procedure utilized was "impermissibly suggestive").

{¶ 64} We have previously held that, absent improper conduct prior to an in-court identification, a witness's "inability or unwillingness to identify a defendant in a pre-trial setting does not necessarily discredit an in-court identification." *State v. Ndiaye*, 10th Dist. No. 13AP-964, 2014-Ohio-3206, ¶ 9. *See State v. Dennis*, 10th Dist. No. 05AP-1290, 2006-Ohio-5777, ¶ 12 (finding defendant's conviction was not against the manifest weight of the evidence where witnesses who "initially did not identify defendant as the assailant from a six-photo array" identified the defendant in court); *State v. Johnson*, 163 Ohio App.3d 132, 2005-Ohio-4243, ¶ 57 (10th Dist.). In *Johnson*, we found the "inability or unwillingness to make an identification based on the black-and-white photo arrays did not discredit [the witness's] in-court identification of defendant at the bindover hearing" where "[s]uggestive, out-of-court procedures, which could have possibly invalidated the in-court identification, [were] absent." *Johnson* at ¶ 56-57. We noted the witness "made her identification under oath, in court, and presumably was subject to cross examination," which we found could be "used 'to test [an] identification before it harden[s].' " *Id.* at ¶ 56, quoting *Moore v. Illinois*, 434 U.S. 220, 230(1977), fn. 5. Under the facts and circumstances of this case, having found the photo array was not unnecessarily suggestive and considering that Gardner was subject

to cross-examination at the probable cause hearing, we conclude the juvenile court did not err in considering Gardner's in-court identification of appellant in making its determination that probable cause existed. *Perry* at 233 (holding that "[w]hen no improper law enforcement activity is involved * * * it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt").

### 2. Whether Evidence Supported Probable Cause

{¶ 65} In support of his contention that the juvenile court erred in finding the existence of probable cause, appellant reiterates his claims regarding the unreliability of Gardner's identification combined with the lack of other evidence connecting appellant to the incident.

{¶ 66} At trial, " ' "identity is an element that must be proven by the state beyond a reasonable doubt," ' " whereas the " ' "credibility of witnesses and their degree of certainty in identification are matters affecting the weight of the evidence." ' " *State v. Guy*, 10th Dist. No. 17AP-281, 2018-Ohio-4835, ¶ 20, quoting *State v. Tucker*, 10th Dist. No. 15AP-434, 2016-Ohio-1033, ¶ 13, quoting *State v. Reed*, 10th Dist. No. 08AP-20, 2008-Ohio-6082, ¶ 48. *See State v. Toney*, 7th Dist. No. 14 MA 0083, 2016-Ohio-3296, ¶ 27 ("Identity is an element of both felonious assault and murder."). For purposes of finding probable cause, however, the state need only provide credible evidence that raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt. *In re A.J.S.* at ¶ 42.

{¶ 67} " 'A witness need not be free from doubt when identifying the perpetrator of a crime.' " *Tucker* at ¶ 13, quoting *State v. Cameron*, 10th Dist. No. 10AP-240, 2010-Ohio-6042, ¶ 31. " ' "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." ' " *Tucker* at ¶ 13, quoting *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 18, quoting *State v. Coleman*, 10th Dist. No. 99AP-1387 (Nov. 21, 2000), citing *Manson* at 116.

{¶ 68} Here, Gardner admitted he had been drinking on the night of the incident. He stated he was about five or six feet away from the person he saw with the gun before the

shooting started, and that person was the same one whom he saw shooting at him as he ran away. Although he was only "50 percent" certain regarding the identity of the shooter based on the photo array, he identified appellant as the shooter at the probable cause hearing. Gardner was subject to cross-examination regarding his observations on the night of the shooting and his subsequent identification of the shooter, both through the photo array and the in-court identification. *State v. Powell*, 10th Dist. No. 17AP-808, 2018-Ohio-3944, ¶ 15 (stating that the finder of fact is "in the best position to weigh the credibility of testimony by assessing the demeanor of witnesses and the manner in which they testify, their connection or relationship with the parties, and their interest, if any, in the outcome"). Based on the totality of evidence at the probable cause hearing, we find sufficient, credible evidence supported a finding of probable cause. Accordingly, we overrule appellant's first and third assignments of error.

## IV. Second Assignment of Error—Ineffective Assistance of Counsel

{¶ 69} In his second assignment of error, appellant asserts he received ineffective assistance of counsel because counsel: (1) failed to present expert eyewitness-identification testimony; (2) failed to make a motion to suppress Gardner's identification; and (3) failed to raise or otherwise challenge the reliability of Gardner's identification.

{¶ 70} We apply a two-part test to evaluate claims of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland* at 687. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley* at paragraph three of the syllabus. "Judicial scrutiny of counsel's performance must be highly deferential [and] [b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689; *Bradley* at 141. Finally, we have previously noted outside of the bindover context that a guilty plea "waives the right to assert ineffective assistance of counsel unless the counsel's errors affected the knowing and voluntary nature of the plea." *McMichael* at ¶ 14, citing

*Hill* at ¶ 15, citing *Spates* at 272. *See State v. Caballero,* 10th Dist. No. 15AP-1132, 2016-Ohio-5496, ¶ 30.[3]

{¶ 71} First, appellant's counsel was not deficient for failing to call an expert witness to testify about the reliability of eyewitness testimony. Appellant's counsel extensively cross-examined Grebb and Gardner regarding the identification. It was reasonable trial strategy for appellant's counsel to rely on cross-examination without calling an expert witness. *State v. Nicholas*, 66 Ohio St.3d 431, 436 (1993) ("the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel").

{¶ 72} Second, appellant's counsel was not ineffective for failing to file a motion to suppress Gardner's identification or for allegedly failing to argue the reliability of the identification. As previously noted, appellant's counsel's strategy at the probable cause hearing centered on attacking the identification of appellant. For the reasons detailed in our resolution of appellant's first and third assignments of error, appellant cannot show a reasonable probability that the outcome of the proceeding would have been different had counsel filed a motion to suppress or argue the reliability of the identification. Accordingly, we overrule appellant's second assignment of error.

## V. Conclusion

{¶ 73} Having overruled appellant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and NELSON, JJ., concur.

---

[3] We note the state does not contest whether appellant's guilty plea waived his right to claim ineffective assistance of counsel. As this issue was not raised, it is not necessary to decide the issue and we, therefore, consider appellant's claim. *See Legg* at ¶ 61.